UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **William Perry**, individually, and as the executor of the estate of **Beulah Perry**, deceased, | Claim No. 24CV8736 (LJL) |
| **Plaintiffs,** | **MEMORANDUM OF LAW, IN SUPPORT OF** |
| **v.** | **ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER** |
| **ADA Mark Anthony Monaco, DA Alvin Bragg, ADA Lisa DelPizzo, ADA Stuart Silberg, ADA Erin Tierney, ADA Shira Arnow, ADA Alexandra Wynne, ADA Hannah Perlman, Officer Thomas Mullins, Officer Donjya Bardliving, The City of New York,** | **AND** |
| | **FEDERAL INTERVENTION WITHIN STATE COURT DERIVATIVE PROCEEDINGS** |
| **Defendants,** | |
| -and, Proposed Defendants- | |
| **ADA Virginia Nguyen, ADA Robin McCabe, Hannah Putnam, Annie Seifullah, Rosemarie Leonelli Monaco,** | |
| **Proposed Additional Defendants,**[1] | |
| -and, Proposed Defendant's, sued in their official capacities only- | |
| **Hon. Curtis Farber, Hon. Ruth Pickholz, Hon. Josh Hanshaft, Hon. Abraham Clott, Hon. Joseph A. Zayas, Jorge Dopico, Raymond Vallejo,** | |
| **Proposed Official-Capacity-Defendants.**[1] | |

---

[1] Addition of Proposed Defendant's pending decision on Motion to Amend Complaint, dated 8/25/25 (ECF No. 95).

**Table of Contents**

I.      PRELIMINARY STATEMENT ............................................................................ 1

II.     PROCEDURAL HISTORY ................................................................................ 4

III.    LEGAL STANDARD ........................................................................................ 7

IV.     A TEMPORARY RESTRAINING ORDER IS PROPER UNDER EXISTING LAW
        9

   A.       Likelihood of Success on the Merits ............................................................ 9

      1.     First Amendment: Prior Restraint, Viewpoint Discrimination, and Retaliation. .......... 9

      2.     Fourth Amendment: Unreasonable Search and Seizure of Digital Data. ................... 14

      3.     Sixth and Fourteenth Amendments: Denial of Self-Representation and Access to
             Evidence. .......................................................................................................... 17

      4.     Fourteenth Amendment Due Process: Abuse of Process in Family Court and Attorney
             Disciplinary Proceedings. .................................................................................. 20

      5.     Proper Defendants and Capacity for Injunctive Relief: Ex parte Young and Monell. . 23

   B.       Irreparable Harm .......................................................................................... 27

      1.     Loss of First Amendment Freedoms .................................................................. 27

      2.     Stigma-Plus Reputational Injury (Fourteenth Amendment) ........................... 28

      3.     Threat of Loss of Liberty (Civil Confinement) ................................................. 29

      4.     Ongoing Parallel Proceedings Underscore the Irreparability .......................... 29

   C.       Balance of Equities ..................................................................................... 30

      NOTE REGARDING PENDING MOTION FOR LEAVE TO AMENDED AND
      PROPOSED NEW DEFENDANTS ................................................................... 33

   D.       Relief Sought in the Public Interest ........................................................... 34

      1.     Protecting Free Expression and Civic Engagement .......................................... 34

      2.     Upholding the Institutional Legitimacy of the Courts ...................................... 35

      3.     Separation of Powers and Democratic Accountability ...................................... 37

   E.       Bond ............................................................................................................ 37

V.      FEDERAL INTERVENTION IS PROPER ....................................................... 38

   A.    The Prior Orders Are Being Used in Bad Faith and to Harass ............................ 38

   B.    The Orders Are Patently Unconstitutional on Their Face ................................... 40

   C.    There Is No Adequate Remedy in State Court ..................................................... 41

VI.     CONCLUSION ................................................................................................ 42

# **Table of Authorities**

## **Cases**

ACLU v. Ashcroft,
  542 U.S. 656 (2004) ............................................................................................. 35
Agudath Israel of Am. v. Cuomo,
  983 F.3d 620 (2d Cir. 2020) ................................................................................... 2
*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ............................................................................................... 42
*BE & K Constr. Co. v. NLRB,*
  536 U.S. 516 (2002) .............................................................................................. 36
*Bery v. City of New York,*
  97 F.3d 689 (2d Cir. 1996) ................................................................................. 8, 9
*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
  598 F.3d 30 (2d Cir. 2010) ................................................................................. 2, 8
*Connick v. Myers,*
  461 U.S. 138 (1983) .............................................................................................. 36
*County of Sacramento v. Lewis,*
  523 U.S. 833 (1998) .............................................................................................. 24
*Cullen v. Fliegner,*
  18 F.3d 96 (2d Cir. 1994) ............................................................................... 40, 41
*Doctor's Assocs., Inc. v. Stuart,*
  85 F.3d 975 (2d Cir. 1996) ................................................................................... 39
*Elrod v. Burns,*
  427 U.S. 347 (1976) .................................................................................. 2, 8, 9, 29
*Ex parte Young,*
  209 U.S. 123 (1908) .................................................................................. 24, 25, 45
*Faretta v. California,*
  422 U.S. 806 (1975) ........................................................................................ 19, 20
*Franks v. Delaware,*
  438 U.S. 154 (1978) .............................................................................................. 16
*Gibson v. Berryhill,*
  411 U.S. 564 (1973) .................................................................................. 10, 30, 31, 43
*Grand River Enter. Six Nations, Ltd v. Pryor,*
  481 F.3d 60 (2d Cir. 2007) ..................................................................................... 8
*Hartman v. Moore,*
  547 U.S. 250 (2006) .............................................................................................. 15
*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
  322 U.S. 238 (1944) .............................................................................................. 38
*In re Providence Journal Co.,*
  820 F.2d 1342 (1st Cir. 1986) ............................................................................... 26
*In re Ruffalo,*
  390 U.S. 544 (1968) .............................................................................................. 22
*King v. First Am. Investigations, Inc.,*
  287 F.3d 91 (2d Cir. 2002) ................................................................................... 34

*Koch v. Greenberg*,
  14 F. Supp. 3d 247 (S.D.N.Y. 2014) ........................................................ 34
*Kupferman v. Consol. Research & Mfg. Corp.*,
  459 F.2d 1072 (2d Cir. 1972) ................................................................... 34
*Lewellen v. Raff*,
  843 F.2d 1103 (8th Cir. 1988) .................................................................. 41
*Lindke v. Freed*,
  601 U.S. (2024) ........................................................................................ 43
*Lozman v. City of Riviera Beach*,
  585 U.S. ___ (2018) ........................................................... 15, 29, 31, 36
*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ................................................................................. 12
Matal v. Tam,
  137 S. Ct. 1744, 1763 (2017) ................................................................... 14
*McKaskle v. Wiggins*,
  465 U.S. 168 (1984) ................................................................................. 19
*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
  457 U.S. 423 (1982) ................................................................................. 43
*Monell v. Department of Social Services*,
  436 U.S. 658 (1978) ........................................................................... 24, 26
N.Y. Progress & Prot. PAC v. Walsh,
  733 F.3d 483 (2d Cir. 2013) ........................................................... 2, 8, 35
*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ....................................................... 11, 33, 36, 42
*Netflix, Inc. v. Babin*,
  88 F.4th 1080 (5th Cir. 2023) .................................................................. 41
*Nieves v. Bartlett*,
  587 U.S. ___ (2019) ................................................................................. 15
*O'Connor-Ratcliff v. Garnier*,
  601 U.S. (2024) ........................................................................................ 43
*Organization for a Better Austin v. Keefe*,
  402 U.S. 415 (1971) ................................................................................. 13
*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ............................................................................. 14, 36
*Patterson v. City of Utica*,
  370 F.3d 322 (2d Cir. 2004) ..................................................................... 30
*Pembaur v. City of Cincinnati*,
  475 U.S. 469, 480–81 (1986) ................................................................... 27
*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................................. 12
*Regal Knitwear Co. v. NLRB*,
  324 U.S. 9 (1945) ....................................................................................... 4
*Reporters Committee for Freedom of the Press*,
  489 U.S. 749 (1989) ................................................................................. 18
*Riley v. California*,
  573 U.S. 373 (2014) ................................................................................. 17

iv

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)......................................................................................13
*Rowe v. Griffin*,
    676 F.2d 524 (11th Cir. 1982) ..................................................................41
*Snyder v. Phelps*,
    562 U.S. 443 (2011)......................................................................................11
*Steffel v. Thompson*,
    415 U.S. 452 (1974)......................................................................................44
*Stilp v. Contino*,
    613 F.3d 405 (3d Cir. 2010).........................................................................29
*Street v. New York*,
    394 U.S. 576 (1969)..............................................................................14, 41
*Trainor v. Hernandez*,
    431 U.S. 434 (1977).................................................................................9, 10
*United States v. Cronic*,
    466 U.S. 648 (1984)......................................................................................20
*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006)......................................................................................20
*Valmonte v. Bane*,
    18 F.3d 992 (2d Cir. 1994)...........................................................................30
*Whole Woman's Health v. Jackson*,
    142 S. Ct. 522 (2021)....................................................................................25
*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................7
*Yang v. Kosinski*,
    960 F.3d 119 (2d Cir. 2020).........................................................................38
*Younger v. Harris*,
    401 U.S. 37 (1971)................................................................................passim

### Statutes

42 U.S.C. § 1983 ........................................................................2, 10, 26, 27
42 U.S.C. § 1985 ....................................................................................2, 10
CPL § 440.10 ....................................................................................passim
CPLR Article 78 ...........................................................................2, 5, 33, 46

### Rules

Fed. R. Civ. P. 15(c) ............................................................................4
Fed. R. Civ. P. 19(a)(1)(A) ..................................................................4
Fed. R. Civ. P. 65 .................................................................................1
Fed. R. Civ. P. 65(b)(1).........................................................................9
Fed. R. Civ. P. 65(d) ...........................................................................36
Fed. R. Civ. P. 65(d)(2)...................................................................4, 49

## I.    PRELIMINARY STATEMENT

Plaintiff William Perry, proceeding *pro se*, respectfully submits this Memorandum of Law in support of his application for a Temporary Restraining Order ("TRO") and preliminary injunction under Fed. R. Civ. P. 65.  Plaintiff's proposed Order to Show Cause was filed on **September 9, 2025**, to immediately halt ongoing violations of his rights under the First, Fourth, Sixth, and Fourteenth Amendments.  As detailed in the Second Amended Complaint ("SAC," ECF No. 96) and its exhibits (ECF Nos. 96-1 through 96-6), Defendants—acting under color of state law and in concert with private actors—have engaged in a retaliatory campaign to punish Mr. Perry's public criticism of official misconduct.  This state-sponsored system of prior restraint re-labels Plaintiff's public, non-threatening social media commentary as prohibited "contact" with protected individuals, and uses that pretext to obtain gag orders and even social-media takedowns of Plaintiff's content.  The misconduct includes weaponizing court orders and records to penalize protected speech, obtaining and exploiting private records without lawful cause, and obstructing Mr. Perry's access to counsel and evidence—causing ongoing, irreparable injury to core constitutional rights.

These violations have spilled into collateral arenas—including probation supervision, Family Court (*Putnam v. Perry*, File No. 310809, Dkt. No. O-07006-20, N.Y. Fam. Ct.), and attorney disciplinary (AGC) proceedings (*In re Perry*, First Dep't App. No. 2023-02705)—where officials continue to rely on the same tainted findings and "speech-equals-contact" theory to chill Mr. Perry's speech and gain tactical advantage. The requested relief is **narrow and status-quo-preserving**: it temporarily restrains Defendants from relying upon, disseminating, or enforcing factual findings from the conviction in *People v. Perry*, Ind. No. 01389/21, in collateral forums **while** active constitutional challenges are pending, including (i) a CPL § 440.10 motion

(prosecutorial misconduct/fabricated evidence), (ii) a CPLR Article 78 proceeding (administrative reliance), and (iii) this §§ 1983 and 1985 action.

Mr. Perry satisfies the TRO standard. He is likely to succeed—or at minimum raises **serious questions going to the merits with the balance of hardships tipping decidedly in his favor** (see *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010))—on claims targeting prior restraint and retaliation, unlawful digital searches/retention, and due process/self-representation violations. He faces ongoing irreparable harm from censorship of core political speech (the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Elrod v. Burns, 427 U.S. 347, 373 (1976)), continuing Fourth Amendment intrusions, and professional/reputational injuries that damages cannot remedy. The balance of hardships and the public interest strongly favor relief; "securing First Amendment rights is in the public interest" (N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013)), and the government has no legitimate interest in the enforcement of an unconstitutional law (see id.; see also Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 636 (2d Cir. 2020) (public interest favors enjoining likely constitutional violations)).

<u>Federal Intervention</u>

Limited, prospective federal relief is proper under the recognized exceptions of *Younger v. Harris*, 401 U.S. 37 (1971): (1) bad-faith/harassing use of state processes; (2) enforcement of flagrantly and patently unconstitutional restraints (e.g., gag-style "speech-equals-contact" orders); and (3) extraordinary circumstances causing great and immediate irreparable injury with no adequate state remedy in fact. Mr. Perry does not ask this Court to vacate a state conviction or micromanage state proceedings; he seeks narrowly tailored, emergency restraints to prevent further collateral weaponization of unconstitutional orders and tainted findings while his

constitutional challenges are adjudicated.  Absent intervention, Plaintiff will suffer irreparable constitutional injury: suppression of core political speech, professional and reputational ruin, and loss of parental and liberty rights—all grounded in a proceeding tainted by systemic abuse.

Procedural Posture of TRO

Plaintiff moved for leave to file the SAC (ECF No. 95), which would add several new defendants.  These Defendant's include:

   a) **Manhattan ADAs** Virginia Nguyen, and Robin McCabe;

   b) **Private Citizens**, Hannah Putnam; Annie Seifullah; and Rosemarie Leonelli Monaco; and

in their official capacity,

   c) **New York Supreme Court Judges**, Hon. Curtis Farber, Hon. Ruth Pickholz, Hon. Josh Hanshaft, Hon. Abraham Clott, and Hon. Joseph A. Zayas; and

   d) as **Attorney Grievance Committee** officials, Jorge Dopico, and Raymond Vallejo.

That motion remains pending; these individuals are not yet formal parties. The Court may: (1) grant the Motion for Leave and deem the Second Amended Complaint ("**SAC**") filed and operative, then enter the TRO; or (2) enter a TRO now as to existing parties and persons in active concert who have actual notice, see Fed. R. Civ. P. 65(d)(2), and automatically extend the Order to newly added parties upon grant of leave and service.  See *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) (injunction binds those who aid/abet violations).  The Court may also add parties "on just terms" at any time, Fed. R. Civ. P. 19(a)(1)(A), and any limitations concerns are addressed by Rule 15(c) relation-back where applicable. This sequencing prevents any protection gap while fully respecting joinder and due-process limits.

## II.    PROCEDURAL HISTORY

Plaintiff William Perry is a former attorney and technology investment banker who was prosecuted in *People v. Perry*, Ind. No. 01389/21 (Sup. Ct., N.Y. Cnty.), for conduct consisting entirely of protected speech.  The prosecution was triggered by Plaintiff's social media speech activity, which criticized public officials, exposed racial disparities in the criminal legal system, and challenged the credibility of the Manhattan District Attorney's Office.  That proceeding—and the conduct of the DA's Office—remains the subject of multiple ongoing constitutional challenges, including:

    i.    a CPL § 440.10 motion based on ineffective assistance of counsel, juror misconduct, and violations of due process;

    ii.    a CPLR Article 78 special proceeding contesting the integrity of the fact-finding process and related administrative actions (Index No. 2025-01936); and

    iii.    this federal civil rights action, *Perry v. Monaco et al*, No. 24CV8736 (S.D.N.Y.).

On December 1, 2024, Plaintiff filed a motion pursuant to New York CPL § 440.10, seeking vacatur of his conviction based on constitutional violations, including suppression of exculpatory material, improper coordination between prosecutors and civil litigants, and retaliation for protected speech.  The trial court has indicated it intends to await a discretionary ruling on leave to appeal from the New York Court of Appeals.  The Appellate Division declined to review the merits, holding that the issues had not been preserved at the trial level—leaving Plaintiff without access to appellate redress.

On May 12, 2025, Plaintiff filed a motion in the New York Supreme Court, Criminal Term, to renew and modify all prior gag and protective orders issued in *People v. Perry*, Ind. No. 01389/21, pursuant to CPLR § 2221(e), on the basis of new facts and intervening constitutional developments. See SAC paragraph 121.  That motion disclosed that Plaintiff had publicly

reposted—verbatim—the same speech at issue in the original prosecution, and had contemporaneously notified the District Attorney's Office. Despite these deliberate provocations, no enforcement action was taken, confirming the unconstitutional selectivity of the original proceeding.

On May 20, 2025, Plaintiff followed with a formal email motion to the presiding judge, the Hon. Abraham Clott, requesting resolution of the May 12 motion and raising urgent First Amendment concerns. That correspondence expressly distinguished the May 12 application from Plaintiff's pending CPL § 440.10 motion and asked for interim clarification as to whether Plaintiff's ongoing public commentary was lawful. See SAC paragraph 121.

Still receiving no action, Plaintiff sent a June 5, 2025 follow-up letter to Judge Clott advising that the return date on the May 12 motion had passed without scheduling or response. The letter emphasized the irreparable harm caused by continued silence and enclosed a draft federal motion for injunctive relief—styled as a "stalking horse" filing—prepared for immediate filing in the Southern District of New York. Within the June 5, 2025 supplemental letter to Judge Clott, Plaintiff  enclosed a draft federal injunction motion—the so-called "stalking horse" motion—to emphasize the urgency and constitutional significance of the pending issue. The Stalking Horse motion is a preliminary FORM OF draft motion for injunctive relief. It is intended to signal to Judge Clott, that absent state judicial action, that Plaintiff would be forced to seek relief at the federal level.

On June 16, 2025, Plaintiff submitted a second supplemental submission and email follow-up to the June 5 filing. This submission reiterated the ongoing irreparable harm stemming from unconstitutional gag orders and provocatively challenged the logic underlying the People's theory of enforcement. Plaintiff noted that he had recently published additional public posts to Instagram

mocking the Court and referencing Judge Clott by name—acts previously deemed sanctionable under the orders in question. These references were made in a satirical tone using Monty Python to underscore that ridicule of public officials is not tantamount to threat. No law enforcement visited Plaintiff's home, and no prosecution was initiated. The filing argued that this silence confirmed the orders were never about victim safety, but about silencing criticism and shielding prosecutorial misconduct. Plaintiff included the chamber email of Judge Liman (LimanNYSDChambers@nysd.uscourts.gov) on the June 16 email, reinforcing the transparency and seriousness of his communications. The June 16 email and filing are attached hereto as **Exhibit A**; provided to substantiate the procedural history above.

Since October 2024, Plaintiff has systematically republished all allegedly offensive content. The DA has taken no enforcement steps. The District Attorney's sustained inaction—despite months of deliberate and confrontational republication—operates as a *de facto* concession that the prior theory of criminality was constitutionally unenforceable. As such, the state's failure to act supports Plaintiff's claim that the prior prosecution was retaliatory and that the resulting orders lack continuing legal force. A temporary restraining order is now required to formalize this posture, prevent further constitutional injury, and ensure that invalid fact-findings are not improperly leveraged in collateral or civil proceedings.

Absent temporary injunctive relief, Plaintiff faces irreparable injury: reputational and professional ruin, suppression of core political expression, and the imminent threat of civil incarceration—all grounded in proceedings infected by structural constitutional error. Federal intervention is now required to prevent these harms and preserve the status quo.

### III.  <u>LEGAL STANDARD</u>

The issuance of a temporary restraining order or preliminary injunction is governed by Rule 65 of the Federal Rules of Civil Procedure.  Such relief is warranted where the movant demonstrates:

A. **Irreparable Harm**: Plaintiff faces reputational injury, suspension from the legal profession, suppression of protected speech, and the imminent threat of incarceration;

B. **Likelihood of Success**: The Second Amended Complaint states meritorious claims under the First, Fourth, Sixth and Fourteenth Amendments;

C. **Balance of Equities**: The equities favor Plaintiff's interest in preventing the enforcement of constitutionally infirm findings;

D. **Public Interest**: The public has a strong interest in preventing the misuse of tainted proceedings to silence dissent and damage reputations.

*See Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7 (2008); *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30 (2d Cir. 2010) (reaffirming Second Circuit's "serious questions" alternative standard after Winter, so long as the other factors, including a decidedly favorable balance of hardships, are met).  In this Circuit, the serious-questions standard allows flexibility where the balance of hardships and the public interest strongly favor the movant, requiring only that the merits present a fair ground for litigation rather than a greater than 50% likelihood of success.

Where constitutional rights—particularly First Amendment rights—are at issue, courts apply heightened scrutiny. Violations of such rights are presumed to constitute irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996).  This presumption also applies where official conduct chills protected speech or imposes sanctions based on constitutionally defective proceedings.  Moreover, when an alleged official policy is infringing constitutional rights en masse (as here, affecting not only Plaintiff but also

"public discourse" at large), an injunction serves the public interest by halting those violations. The Second Circuit has expressly noted that "[s]ecuring First Amendment rights is in itself a strong public interest" that favors injunctive relief. N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483 (2d Cir. 2013).

To warrant emergency relief, the movant must "demonstrate that absent a preliminary injunction they will suffer "an injury that is neither remote nor speculative, but actual and imminent." *Grand River Enter. Six Nations, Ltd v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). "[V]iolations of First Amendment rights are presumed to cause irreparable harm." *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996); *Elrod* at 373 (1976). Similarly, the continued enforcement or publication of sanctions imposed through constitutionally defective processes constitutes irreparable injury warranting equitable intervention.

Under Rule 65(b)(1), a temporary restraining order may issue without notice if: (A) specific facts in an affidavit or verified complaint "clearly show that immediate and irreparable injury … will result before the adverse party can be heard in opposition," and (B) the movant certifies in writing any efforts made to provide notice and explains why notice should not be required. Even where notice has been provided, courts may grant emergency relief where constitutional rights are under immediate threat and where procedural fairness has been constructively denied through retaliatory or selective enforcement mechanisms.

Where the challenged conduct arises from a state proceeding, the Court must consider the abstention principles articulated in *Younger v. Harris*, 401 U.S. 37 (1971) doctrine. *Younger* abstention is appropriate only where:

1. The state proceeding is brought in **bad faith or with intent to harass**, *Younger* at 49;

2. The law or order being enforced is **patently unconstitutional**, *Trainor v. Hernandez*, 431 U.S. 434, 447 (1977); or

3. The plaintiff has **no adequate remedy in state court**, *Gibson v. Berryhill*, 411 U.S. 564, at *577, *n16 (1973).

When one or more of these conditions is met, federal courts may intervene to protect constitutional rights, especially those involving expressive freedom and public criticism of government. The *Younger* doctrine may be invoked in collateral proceedings, such as those based on summary judgment or collateral estoppel, so long as the original underlying state proceeding is ongoing (including direct appeal) and the collateral proceeding is sufficiently intertwined with or derivative of the original action. *Trainor* at 443-444 ("The principles of *Younger* […]are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity").

## IV.    A TEMPORARY RESTRAINING ORDER IS PROPER UNDER EXISTING LAW

### A. *Likelihood of Success on the Merits*

Plaintiff has brought several constitutional claims under 42 U.S.C. §§ 1983 and 1985, and for purposes of this motion need only show a likelihood of success on one of them (since an injunction can issue to prevent even a single constitutional violation). However, here Plaintiff is likely to succeed on many claims. At the very least, Plaintiff has raised "serious questions going to the merits" on each claim, given the substantial evidence of wrongdoing, and the balance of hardships tips decidedly in their favor.

#### 1. *First Amendment: Prior Restraint, Viewpoint Discrimination, and Retaliation.*

Defendants' concerted actions constitute both an unlawful **prior restraint** on speech and impermissible **content** and **viewpoint discrimination**, as well as **retaliation** for Plaintiff's

protected expression. Plaintiffs are exceedingly likely to prevail on the merits of these First Amendment claims.

### Prior Restraint / "Speech-Equals-Contact" Gag Orders

The orders and directives that prohibit Mr. Perry from posting on social media about certain people or events – on pain of being deemed in violation of a court order – are classic prior restraints. A prior restraint is any administrative or judicial order that forbids future speech activities before the speech occurs. See *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556–57 (1976). Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights," and any system of prior restraint bears a **heavy presumption** against constitutional validity. *Id.* at 558–59. Here, Defendants (through court orders in the criminal case and directives to social media platforms) have effectively gagged Mr. Perry from speaking **publicly** about the very **government conduct** that aggrieves him – namely, the prosecutorial and judicial actions in his case. Such an injunction against criticizing public officials, and their actions, strikes at the heart of the First Amendment's protection of free political discourse. It is black-letter law that "speech on matters of public concern" – especially speech critical of government officials – occupies the highest rung of First Amendment protection. *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011).

While protecting individuals from true threats or harassment is a legitimate interest, the existing orders already prohibit direct harassment or contact; Mr. Perry's speech at issue consists of **public commentary** on social media, not direct communication or threats. The government cannot bootstrap a general no-contact order into a blanket gag on speech **about** the protected person. The Supreme Court made clear in *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994), that even when a court is fashioning an injunction to protect certain interests (in *Madsen*,

to protect clinic patients from harassment), the injunction must burden no more speech than necessary – it **must be narrowly tailored**.  In *Madsen*, the Court struck down portions of an injunction that created a broad buffer zone where speech was limited, because it burdened more speech than needed to serve the safety interest. *Id.* at 770.  Here, an order reinterpreted to bar even **"online mentions"** of a person as if they were direct communication is certainly not narrowly tailored.  It suppresses a vast amount of lawful speech that poses no genuine threat to anyone.

The "speech-equals-contact" theory is content-based on its face.  It punishes Mr. Perry's speech because of its subject matter (speech about the protected person or about the case).  A generic post by Mr. Perry on his own Instagram page – for example, complaining "ADA Monaco abused his power in my case concerning Hannah Putnam" – is treated as contempt **only because** it references the ADA and a witness; if he posted a recipe or a sports comment, it would not be deemed "contact."  This is a content-based distinction. Under *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), the government generally may not selectively ban speech based on content, even if the underlying category of speech could be regulated in a content-neutral way (e.g., one cannot forbid only "harassing" speech about certain topics or people while permitting other harassing speech).  The Hanshaft Order described in the SAC – equating any "electronic mention" of the complainant to prohibited communication – is a paradigmatic content-based (indeed, viewpoint-based) restriction, since it specifically targets negative commentary by Mr. Perry.  Content-based injunctions are subject to strict scrutiny.  Defendants have not shown, and cannot show, that Mr. Perry's public speech causes a direct, immediate, and irreparable harm that would justify this extreme prior restraint.  Importantly, *nothing in Plaintiff's public posts has been alleged to be a true threat, incitement, or otherwise unprotected speech.*  The SAC avers that Plaintiff's posts were non-threatening criticisms or narratives about the case. The TRO that Plaintiff seeks

explicitly permits enforcement of laws against true threats, incitement, etc., so no legitimate safety interest will be harmed by enjoining the overbroad gag. Simply put, the First Amendment does not allow the government to silence a person just because their speech is unwelcome or discomforting to officials or witnesses. See *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971) (injunction aimed at preventing petitioner from distributing leaflets critical of respondent was an unconstitutional prior restraint: "No prior decisions support the claim that the interest of an individual… in being free from public criticism… warrants use of the injunctive power"). Plaintiffs are likely to succeed in having these gag orders struck down as unconstitutional prior restraints.

### Viewpoint Discrimination and Social Media Takedowns

The evidence suggests that Defendants not only gagged Mr. Perry through court orders but also **coordinated with social media platforms** or otherwise induced the removal of his online content because it was critical of the DA's Office. "Discrimination against speech because of its message is presumed to be unconstitutional." See *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-9 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). If, as alleged, ADA Bragg's office or its agents flagged Mr. Perry's posts for takedown **because they were critical of prosecutors and a prior witness**, that is textbook viewpoint discrimination. The First Amendment prohibits using discretionary government power to silence opponents or unfavorable commentary. Even in a nonpublic forum, viewpoint discrimination is impermissible. *See* Matal v. Tam, 137 S. Ct. 1744, 1763 (2017) ("We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" citing *Street v. New York*, 394 U.S. 576 (1969)). Social media

today is the modern public square, **"perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard"**, such that to ban someone from speaking there (or to selectively remove their posts) is to foreclose a vital channel of communication. *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Government officials certainly cannot command social media companies to censor lawful speech – that would be a violation of the First Amendment (as state action in concert with private platforms). This includes throttling speech. Discovery in this case will show such coordination took place. Plaintiffs are likely to prevail on a claim that Defendants engaged in forbidden viewpoint discrimination, warranting injunctive relief. At a bare minimum, these allegations raise "serious questions" appropriate for litigation, further supporting interim relief to halt any ongoing suppression (the TRO would bar Defendants from continuing to seek "platform takedowns" of Mr. Perry's protected speech).

**Retaliation for Protected Speech**

Independently, Plaintiffs are likely to succeed on their First Amendment retaliation claim. To establish retaliation, a plaintiff must show (1) he engaged in protected speech activity, (2) the government took adverse actions against him that would deter a person of ordinary firmness from continuing to speak, and (3) the adverse action was motivated or substantially caused by the plaintiff's speech. *See Lozman v. City of Riviera Beach*, 585 U.S. ___ (2018); *Hartman v. Moore*, 547 U.S. 250 (2006); and *Nieves v. Bartlett*, 587 U.S. ___ (2019). All three elements are met here. Mr. Perry's public speech exposing alleged misconduct by a prosecutor and court actors is unquestionably protected activity – it lies at the core of the First Amendment's purpose to enable citizens to criticize their government. Defendants then took a series of adverse actions: they secured broad orders effectively gagging him; they initiated contempt proceedings or threatened arrest for his postings; they applied for sweeping search warrants shortly after he began naming

ADA Monaco online (a suspicious timing indicating a retaliatory motive); they allegedly instigated and coordinated collateral proceedings (Family Court petitions, etc.) to punish him for the same speech.  These actions certainly would deter an average person from speaking out – indeed, the SAC details that Plaintiff's supporters were also intimidated (the DA's office even targeted those who echoed Plaintiff's allegations).  Finally, causation: the chronology and statements by Defendants strongly show a retaliatory intent.  The SAC alleges that **only after** Mr. Perry published commentary embarrassing the DA's office did the prosecutors escalate the case – obtaining a flood of warrants, tacking on charges, etc.

Thus, Plaintiffs have a high likelihood of success on the First Amendment claims.  The TRO therefore appropriately would enjoin enforcement of the speech restraints and any further retaliation.

### 2.  Fourth Amendment:
### Unreasonable Search and Seizure of Digital Data.

Plaintiffs also demonstrate a likelihood of success on their Fourth Amendment claims challenging the **search warrants and seizures of Mr. Perry's digital data**, including the retention and use of that data and the acquisition of private records of non-party Beulah Perry.  The Fourth Amendment guarantees the right to be secure against unreasonable searches and seizures, and mandates that warrants particularly describe what can be searched or seized.  Here, the SAC alleges that Defendants violated these principles in multiple respects.

First, Plaintiffs are likely to prove that the **search warrants for Mr. Perry's electronic devices and accounts were unlawfully obtained** by means of material misrepresentations or omissions – a *Franks v. Delaware* violation.  *Franks v. Delaware*, 438 U.S. 154 (1978), holds that if officers procure a warrant by deliberately or recklessly providing false information or omitting material information, and the corrected affidavit would not establish probable cause, then the

warrant is void and the search violates the Fourth Amendment. The SAC pleads detailed facts suggesting ADA Monaco and others swore out warrant affidavits that omitted exculpatory facts, and passed off personal impressions as conclusory fact. It also alleges fabricated evidence was presented to justify the digital dragnet. If proven, these facts mean the warrants lacked genuine probable cause and were unlawfully issued. A warrant **obtained by fraud** is no warrant at all; any search under it is per se unreasonable. Plaintiff has a substantial likelihood of so proving, particularly given the unusual breadth of these warrants (discussed next) and the context of personal animus.

Second, even setting aside Franks issues, the warrants appear **unconstitutionally overbroad and lacking particularity**. The Fourth Amendment forbids general warrants – ones that give officers *carte blanche* to rummage through a person's belongings in search of any evidence of wrongdoing. Yet Defendants' warrants, as described, **authorized the seizure of virtually every byte of data** from Mr. Perry's phones, computer, and cloud accounts, without limitation to specific crimes or data ranges. The SAC explicitly calls them "modern-day general warrants". For example, instead of limiting the search to communications with a particular person or about a particular incident, the warrants demanded wholesale access to all emails, photos, documents, etc., sweeping up highly personal information irrelevant to any plausible investigation. Under Supreme Court precedent, such breadth is impermissible. In *Riley v. California*, 573 U.S. 373 (2014), the Court recognized that cell phones contain the "privacies of life" and held that police generally must get a warrant before searching them – strongly implying that warrants for digital data must be crafted with care to avoid becoming exploratory licenses. A warrant that effectively authorizes a fishing expedition through someone's entire digital life fails the particularity requirement and is overbroad.

15

Third, the **seizure of Mrs. Beulah Perry's FBI file** – having no relation to the present matter – is plainly unlawful. Private background records compiled by the FBI are highly sensitive. In **Reporters Committee for Freedom of the Press**, the Supreme Court recognized an individual's significant privacy interest in their "rap sheet" and criminal history, likening it to a compilation of personal data that the individual controls. 489 U.S. 749, 763–65 (1989). If Defendants obtained Mrs. Perry's FBI record through a known fraudulent warrant by abusing law enforcement channels, that is a violation of her Fourth Amendment (and perhaps Fourteenth Amendment privacy) rights – and it was done to **chill Mr. Perry's speech**, a doubly unconstitutional purpose. At minimum, Plaintiffs will likely succeed on a claim that using or disseminating that information further (absent cause) is unlawful. The TRO seeks to mitigate this by requiring its return or destruction and notice to any third parties it was shared with. Defendants should not be allowed to exploit an unlawfully obtained file for strategic gain.

In defending the warrants, Defendants may claim they had probable cause to believe Mr. Perry harassed Ms. Putnam or similar. But even if some cause existed to search certain devices or accounts for specific evidence, it would not excuse the **wholesale sweep** they conducted. The involvement of high-level officials in approving these tactics (the SAC notes ADA DelPizzo's personal approval of the warrants and the office's failure to discipline the overreach) actually bolsters Plaintiffs' case by showing a policy or custom (important for Monell, addressed below). Plaintiffs are likely to show the searches were not isolated incidents but part of a retaliatory strategy by the DA's Office – which would also support a finding of **improper motive** (retaliation) under the First Amendment, as discussed, and **abuse of process** under the Due Process clause.

In sum, Plaintiffs have a strong likelihood of success in establishing that the search and seizure of Mr. Perry's digital data (and Mrs. Perry's records) violated the Fourth Amendment. At

the very least, these claims raise serious and substantial questions justifying interim relief to preserve the status quo (i.e., prevent further use of the data and require an accounting). Accordingly, the TRO appropriately would require Defendants to **segregate and not use the seized data, and to disclose its whereabouts and ultimately expunge it if it was unlawfully obtained**.

### 3. _Sixth and Fourteenth Amendments:_
### _Denial of Self-Representation and Access to Evidence._

Plaintiffs are also likely to prevail on their claims that Defendants' conduct has violated Mr. Perry's rights under the Sixth Amendment (as applied to the states via the Fourteenth) and the Due Process Clause of the Fourteenth Amendment by obstructing his ability to represent himself and by effectively depriving him of access to the evidence needed to defend himself.

The **Sixth Amendment** guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right… to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  This right has two interrelated aspects: the right to counsel of one's choice (or appointed if indigent), and conversely, the right to decline counsel and represent oneself (_pro se_) if one knowingly and voluntarily elects to do so.  The latter was firmly established in _Faretta v. California_, 422 U.S. 806 (1975), where the Supreme Court held that a defendant in a state criminal trial has an independent constitutional right of self-representation and may proceed without counsel if he clearly asserts that right.  The Court in _Faretta_ recognized that forcing counsel on a defendant against his will "violates the logic of the Amendment" by depriving the defendant of control over his own defense. _Id._ at 821. Once a defendant properly invokes self-representation (and is competent to do so), the denial of that right is structural error – it requires reversal of a conviction because it affects the entire framework of trial.  _McKaskle v. Wiggins_, 465 U.S. 168 (1984).

In Mr. Perry's case, the SAC alleges that he **twice moved to discharge his counsel and proceed pro se** – once in August 2023 during post-trial proceedings, and again in July 2025.  These motions were motivated by his need to personally access and review the discovery that remained under seal.  Rather than honor Mr. Perry's constitutional choice, Defendants (through judicial officers working closely with the DA) "coordinated" to **deny him self-representation**.  According to the SAC, the prosecution insisted on maintaining the protective order such that if Mr. Perry went pro se, he'd be unable to see the evidence, and the court refused to lift or modify that order, effectively forcing Mr. Perry to keep counsel if he wanted a meaningful review of the evidence.  In other words, Defendants imposed a **"Catch-22"**: Mr. Perry could either keep a lawyer (who could see the evidence but, by extension, Mr. Perry would not be permitted to possess it himself), or he could go pro se but then the key evidence would remain off-limits to him.  This condition is described aptly as a "poison pill" on Mr. Perry's *Faretta* right.  It is hard to imagine a more direct obstruction of the Sixth Amendment's core guarantee.  Essentially, Defendants made Mr. Perry's constitutional rights **conditional** on giving up another constitutional right.

This runs afoul not only of *Faretta*, but also of the fundamental due process concept of a fair hearing.  A defendant representing himself must be given reasonable access to "the tools necessary to prepare and present his defense." *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (the right to counsel of choice, or to self-representation, is fundamental; erroneous deprivation of it is structural error). Additionally, under *United States v. Cronic*, 466 U.S. 648 (1984), certain state interferences with the ability of counsel (or a pro se defendant) to provide effective representation are presumptively prejudicial – for example, if the defendant is denied access to his attorney or to crucial information, the adversarial process itself is undermined, and prejudice is presumed without need for specific outcome-determinative proof. *Id.* at 659-62.  Here,

by keeping Mr. Perry in the dark about the evidence constant procedural hurdles, the State ensured that no meaningful adversarial testing of the prosecution's case could occur in the post-conviction process.  That is equivalent to a *Cronic* scenario of state interference in representation (like telling defense counsel they cannot consult with their client or cannot use certain evidence). It is a structural defect in the proceedings.

Plaintiffs are likely to succeed in showing that the **protective order regime, as applied, violated due process and Sixth Amendment rights**.  It had no legitimate justification by the time of post-conviction proceedings – any concern about witness safety or confidentiality could have been addressed through more tailored means (e.g., a limited non-dissemination agreement) rather than a total prohibition on Mr. Perry's independent viewing of the materials. Notably, by post-trial, much of the evidence had been aired in open court or summarized on the record, yet Defendants still absurdly treated Mr. Perry as if he must not see it.  This strongly suggests the true motive was to **hamper his *pro se* efforts** (perhaps to prevent him from identifying inconsistencies or misconduct in the discovery).  That is not a valid use of a protective order; it is an abuse of it.

Because Mr. Perry was effectively deprived of **self-counsel at the critical stage** of preparing a 440 motion, Plaintiffs have a very high likelihood of demonstrating a constitutional violation.  They seek in this motion a narrow remedy: simply that Mr. Perry be allowed to **personally inspect, and independently review, and copy the discovery** from his case, under reasonable supervision and safeguards, so that he can litigate his post-conviction motion and this civil action.  Such relief is plainly warranted to restore his rights.  Given the clear merits of Plaintiff's position, likelihood of success is strong here.

19

### 4.  *Fourteenth Amendment Due Process:*
*Abuse of Process in Family Court and Attorney Disciplinary Proceedings.*

In addition to the specific contexts above, Plaintiffs raise broader Fourteenth Amendment due process claims concerning the **misuse of legal processes** (Family Court, probation, and attorney grievance procedures) to punish Plaintiff without fair procedures.  The Due Process Clause has both procedural and substantive components.  Procedurally, it guarantees that the government cannot deprive a person of liberty or property without notice and a fair opportunity to be heard by an impartial tribunal.  Substantively, it protects against government action that is **arbitrary** or **conscience-shocking**, even if procedural niceties are followed.

**Procedural Due Process:** The record indicates that Defendants orchestrated or encouraged Family Court and probation enforcement actions against Mr. Perry in a manner that bypassed normal safeguards.  For example, Ms. Putnam (a private co-defendant acting with the encouragement of ADA Perlman and others) filed petitions in Family Court seeking restraining orders or contempt findings against Mr. Perry, **based solely on his public internet posts**.  These proceedings, while ostensibly civil, carried the threat of incarceration or other liberty impacts (e.g., potential jail for contempt or expanded restraining orders).  Yet the theory advanced – that Mr. Perry's public speech, not directed at Ms. Putnam, somehow violated a prior order – effectively denied him fair notice of what conduct was forbidden.  Due process requires that injunctions and orders be clear in what they prohibit.  If Mr. Perry was subject to a standard "no contact" order (common in criminal cases), nothing on its face warned him that talking **about** the complainant on Facebook would be deemed a violation.  By reinterpreting it after the fact to include such speech, Defendants gave no notice and no fair hearing on that interpretation. That smacks of **bad faith use of judicial process**, which the Fourteenth Amendment forbids.

Similarly, with regard to the **Attorney Grievance Committee (AGC)**, Plaintiffs allege that the process was fundamentally flawed. If Mr. Perry is the target of a grievance proceeding, he is entitled to due process in that forum. Attorney discipline in New York is quasi-judicial and must comport with due process, including notice of charges, an opportunity to respond, and a fair consideration of evidence. *See In re Ruffalo*, 390 U.S. 544, 550–51 (1968) (lawyer disciplinary proceedings must afford due process; introducing new charges without notice violated due process). The SAC suggests the AGC might rely on Mr. Perry's criminal conviction (which is on appeal or subject to a 440 motion) as a basis to discipline or silence him. If that conviction is not final, using it punitively now would be premature and a potential due process violation. The SAC also raises concern about **asymmetric gag rules**: typically, in grievance proceedings, the complainant or witnesses may leak or discuss the matter (even if technically confidential), while the respondent is often strongly cautioned or effectively silenced from public comment under fear that it will be deemed lack of remorse or a confidentiality breach. Plaintiffs argue that if the AGC were to impose or enforce any such one-sided confidentiality – preventing Mr. Perry from defending himself publicly while others (perhaps including AGC staff or opposing parties) can smear him – that would violate the First Amendment and due process.

The TRO does not shut down any AGC proceeding; it merely asks for **"guardrails"** to ensure fairness: that the AGC not rely on non-final conviction, that Mr. Perry be given access to any evidence subject to protective seal, and that the de facto gag order be modified to permit Mr. Perry to publicly refute the statements of the AGC. This is modest, prospective relief entirely consistent with due process requirements. Given the patterns shown, Plaintiffs have at least raised **serious questions** on how these collateral proceedings are being weaponized. And under the doctrine of *Younger* **abstention**, while federal courts generally avoid enjoining ongoing state

proceedings, an exception exists for bad-faith or harassing proceedings initiated to retaliate for or deter constitutional activity.

**Substantive Due Process:** Beyond procedural issues, Plaintiffs contend that Defendants' conduct overall is so egregious and arbitrary that it violates substantive due process. Substantive due process protects individuals from government conduct that "shocks the conscience" or interferes with rights implicit in the concept of ordered liberty, where no more specific constitutional provision applies. Many of Plaintiffs' allegations do fall under specific amendments (First, Fourth, Sixth), but to the extent any aspect does not, the substantive due process catch-all can apply. For instance, if one views Defendants' entire course of conduct – colluding to misuse judicial power, fabricating evidence, exploiting confidential files – as a campaign of oppressive official misconduct, one could say it "shocks the conscience" in a constitutional sense (especially if done with intent to injure outside any legitimate governmental aim). *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (executive abuse of power that "shocks the conscience" violates substantive due process). The Fourteenth Amendment also specially protects certain fundamental interests like family integrity. To the extent Defendants coordinated to drag Mr. Perry into Family Court on baseless charges, thereby threatening his liberty rights, that implicates a fundamental right. Using false or pretextual allegations in that realm would be a substantive due process violation.

Ultimately, Plaintiffs have made a strong showing that they will succeed on due process claims. The TRO appropriately seeks to prevent further procedural unfairness: it halts any Family Court or probation actions premised on the speech in question (making clear that **public, non-threatening speech cannot be the basis of a "contact" or "harassment" finding**), and it ensures

fairness in any AGC action. These measures align with likely success on the merits of Plaintiffs' due process arguments.

5. _Proper Defendants and Capacity for Injunctive Relief: Ex parte Young and Monell._

Finally, Plaintiffs are likely to succeed in showing that the Defendants they have sued are proper targets for the injunctive relief under well-established law – specifically, the **Ex parte Young** doctrine (for state officials) and **Monell** liability (for municipal entities). Defendants cannot escape injunctive relief by invoking sovereign immunity or by claiming no municipal policy is involved.

**State Officials – Ex parte Young:** Several Defendants (Hon. Farber, Pickholz, Hanshaft, Clott, and Judge Zayas, as well as AGC officials Dopico and Vallejo) are state officers, sued in their official capacities solely for prospective relief. Normally, the Eleventh Amendment bars suits in federal court against state officials acting in their official capacity when the relief sought is retroactive (e.g., damages paid from the state treasury). However, under the **Ex parte Young** doctrine, a plaintiff may sue state officers in their official capacity for **prospective injunctive or declaratory relief** to end an ongoing violation of federal law. _Ex parte Young_, 209 U.S. 123 (1908), is a well-settled exception to state sovereign immunity: it rests on the fiction that an official acting unconstitutionally is not truly acting for the state, and thus can be enjoined. Here, Plaintiff seeks only forward-looking relief (no damages) against these officials, to stop them from continuing to enforce or apply unconstitutional policies (gag orders, etc.). This is classic _Young_ territory. For example, Plaintiffs seek to enjoin the **state judges** Farber, Pickholz, Hanshaft, and Clott from enforcing any "no social-media speech" interpretations of their orders, and to direct Judge Zayas (the administrative judge) to ensure court rules or policies do not gag Mr. Perry's public speech or deny him evidence access. This is permissible. Federal courts can enjoin state judges from enforcing unconstitutional orders – such as a gag order that violates the First

Amendment – because the relief is not against the state court as a whole, but against the enforcement of an unconstitutional mandate. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (reaffirming that under Ex parte Young, "state agents" can be enjoined from enforcing unconstitutional laws or orders). Similarly, Plaintiffs ask that AGC officials Dopico and Vallejo be prospectively enjoined to conduct any disciplinary matter in a constitutional manner (not relying on void orders or gagging Mr. Perry's speech). This too is within *Young*. The Eleventh Amendment poses no bar.

Plaintiff acknowledges that 42 U.S.C. § 1983 generally disallows injunctive relief against a judicial officer for acts taken in a judicial capacity unless a declaratory decree was violated or unavailable (see 42 U.S.C. § 1983, as amended in 1996). However, that limitation is not meant to enable ongoing constitutional violations by courts – it mainly requires that plaintiffs seek declaratory relief first if feasible. Here, Plaintiff effectively is seeking a form of declaratory relief (a ruling that the protective/gag orders are unconstitutional) ancillary to the injunction. And declaratory relief is arguably unavailable in practice because the harm is immediate. Moreover, the official-capacity judges here are heavily alleged to be acting in concert with the prosecutors to enforce not neutral judicial orders, but rather a scheme to suppress speech (some orders might even be viewed as made in absence of jurisdiction if they enjoin third-party speech). In any event, many of the acts to be enjoined (such as how an order is interpreted going forward, or how a future petition is handled) are not themselves "judicial acts" yet – so § 1983's caveat may not even trigger. Regardless, courts have enjoined judges in First Amendment cases (for example, enjoining a state judge from enforcing a gag order against the media was found appropriate in *In re Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986)). Thus, Plaintiffs have a clear path to relief against the state officers under Young.

**Municipal Entities and Officers – Monell:** Defendant **City of New York** is sued (on behalf of NYPD and potentially the DA's Office), and the individual ADAs and officers are sued in their personal capacities (for damages later) and official capacities (effectively the equivalent of suing the City or DA's Office for injunctive relief). The City is not protected by sovereign immunity. However, under **Monell v. Department of Social Services**, 436 U.S. 658 (1978), a municipality can be held liable under § 1983 only if the constitutional violation was caused by a municipal **policy or custom**. Plaintiffs are likely to establish such a policy or custom here, thereby rendering the City (and by extension, DA Bragg in his official capacity) a proper target of injunctive relief. Indeed, far from an isolated incident, the acts in question were taken by multiple city officials in a coordinated way, reflecting an official stance. The involvement of **District Attorney Bragg** – a final policymaker for New York County on law enforcement matters – is particularly significant. The SAC alleges that DA Bragg personally approved or ratified the extraordinary tactics (the digital dragnet warrants, the stance on treating speech as contact, etc.). Under Monell, the decisions of an official with final policymaking authority in the relevant area count as the municipality's policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

The complaint details an **official policy or custom of the New York County DA's Office** to aggressively use protective orders to silence defendants and cover up prosecutorial wrongdoing. It cites internal coordination and repeated instances – not only with Mr. Perry but also noting that this implicates "systemic" issues and could warrant class-wide relief.  Additionally, the complicity of multiple ADAs (DelPizzo, Tierney, Arnow, Wynne, Silberg, Monaco, Perlman, Nguyen, McCabe, etc.) suggests this is not rogue behavior but condoned from the top.  Numerous **DA police officers** (including Mullins and Bardliving) executed overbroad warrants and held evidence too long, which the SAC attributes to inadequate training or supervision amounting to deliberate

indifference.  The SAC explicitly invokes *Connick v. Thompson*, 563 U.S. 51 (2011), to allege failure to train ADAs on proper use of protective orders and warrants.  While *Connick* made it hard to prove single-incident failure-to-train, here we have multiple incidents and an alleged pattern.

Monell is satisfied also via the **final policymaker route**: DA Bragg's participation makes the Office's actions the City's actions. Similarly, perhaps Administrative Judge Zayas's role (though a state actor, arguably a City policymaker for court admin).  In short, Plaintiffs can likely show that the City, through its policymakers, was deliberately **using official procedures to suppress constitutional rights** – an unlawful municipal policy.

Therefore, injunctive relief can properly issue against the City and its officers. Courts have authority to enjoin municipalities to change policies or cease enforcement of illegal practices. Indeed, Monell's progeny note that equitable relief is often the only remedy to force institutional change (e.g., injunctions requiring training or ceasing patterns of violations).

In sum, Plaintiffs are likely to succeed in establishing municipal liability under Monell. They have identified policies (e.g., the DA's **"redefinition" of contact under protective orders, the DA's sanctioning of broad warrants and retention, and the City's failure to curb these abuses**). Notably, the relief sought (lifting gag orders, modifying protective orders, returning seized data) can be achieved by actions of the City actors (the DA's office) without violating any state law or interest, so no federalism concerns arise.

For all the above claims – First Amendment, Fourth Amendment, Sixth/Fourteenth, and Due Process – Plaintiffs have demonstrated at least a clear likelihood of success or certainly sufficiently serious questions on the merits. This strongly supports issuance of interim relief.

### B. *Irreparable Harm*

Plaintiff satisfies the TRO requirement of showing irreparable harm because he faces immediate, concrete injuries that cannot be remedied after the fact. The harms at issue – the ongoing suppression of Plaintiff's core speech, the public stigma of a professional suspension, and the threatened loss of liberty through civil confinement – are by their nature not compensable with money damages and will inflict permanent damage absent injunctive relief. Where a claim involves the suppression of speech in violation of the First Amendment, courts place heightened emphasis on the first prong of the preliminary injunction standard—whether the plaintiff is likely to succeed on the merits. **If a First Amendment violation is established, irreparable harm is presumed, and the remaining injunction factors are typically satisfied.** *See Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *Elrod* at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

### 1. *Loss of First Amendment Freedoms*

It is well-settled that "the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." *Elrod* at 373 (1976). Every day that Plaintiff is muzzled by the "speech-equals-contact" gag orders is a day in which he is denied his First Amendment right to speak on matters of public concern. Such prior restraints and the accompanying self-censorship produce an intolerable chilling effect on speech. Here, the threat of contempt and incarceration for discussing certain individuals has forced Plaintiff to silence himself – an injury that cannot be undone by a later court victory.

Moreover, Plaintiff's speech involves criticism of public officials and pending proceedings – expression that "rank[s] high in the hierarchy of First Amendment values". *City of Riviera Beach*, 585 U.S. ___ (2018) (retaliatory policy against citizen for his speech inflicted serious harm on core First Amendment activity; recognizing right to petition as "one of the most precious"

27

liberties).  Its suppression inflicts irreparable injury not only to Plaintiff but to the public discourse, which loses a critical voice on issues of public concern.  No subsequent relief can retroactively facilitate the uninhibited debate that is stifled today.

### 2.  *Stigma-Plus Reputational Injury (Fourteenth Amendment)*

Plaintiff is also suffering ongoing irreparable harm to his liberty interest in reputation and professional status.  The Appellate Division's public broadcast of his suspension in *In re Perry* (App. Div. 1st Dep't No. 2023-02705) has officially branded him with a *stigma* of professional misconduct, at the very moment the underlying conviction is under direct constitutional challenge. This state-imposed stain on his reputation is coupled with concrete deprivations of legal rights – namely, the suspension of his license to practice law (and the attendant loss of employment and income).  Such "*stigma plus*" injuries trigger due process protection because government-inflicted reputational harm paired with a tangible loss (like removal from one's profession) constitutes a serious deprivation of liberty.  Indeed, the Second Circuit has made clear that while "deleterious effects [flowing] directly from a sullied reputation" alone may not suffice, the combination of public stigma with an alteration of legal status – e.g. termination of employment or revocation of a right – satisfies the "plus" prong of a due process claim (see *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004); *Valmonte v. Bane*, 18 F.3d 992, 1001–03 (2d Cir. 1994)).  Here, the reputational injury is not abstract or speculative: Plaintiff's suspension and the public airing of the underlying allegations have already damaged his standing in the community and legal profession. This harm is irreparable. Once a lawyer's name and photo have been disseminated as "suspended" or disgraced, the bell cannot be unrung – even if Plaintiff later clears his name, the permanent taint of the suspension will linger in Google results, legal databases, and the minds of peers and potential clients.  Courts recognize that reputational harm of this magnitude, especially when entwined with the loss of one's profession, cannot be adequately remedied through monetary damages.  *Gibson*

*v. Berryhill*, 411 U.S. 564 (1973). In short, the ongoing violation of Plaintiff's Fourteenth Amendment due process rights – being punished and stigmatized without a constitutionally valid conviction ("stigma-plus") – is causing injury no *post hoc* relief can undo.

### 3.  *Threat of Loss of Liberty (Civil Confinement)*

Finally, Plaintiff faces the imminent threat of civil incarceration in *Putnam v. Perry* (N.Y. Fam. Ct. Dkt. No. O-07006-20), where a Family Court judge is entertaining contempt sanctions premised on the same constitutionally suspect conviction and the "speech-equals-contact" theory. The prospect of being jailed for his speech (under a patently overbroad no-contact order) presents a quintessential irreparable harm: the loss of physical liberty. No amount of after-the-fact relief can restore to a person the days of freedom lost to an unjust confinement. As the Supreme Court has observed, even brief wrongful imprisonment or restraint of personal liberty is irreparable in nature, given that "irreparable injury" is by definition injury that is "both serious and immediate". Here, the injury is not just impending but compounding: Plaintiff would be deprived of his freedom for engaging in speech, magnifying the constitutional harm. The Fourteenth Amendment liberty interest at stake – freedom from bodily restraint – is the most fundamental of all, and its threatened deprivation warrants immediate injunctive protection. See *Gibson v. Berryhill*, 411 U.S. 564 (1973) (federal court intervention is justified where state proceedings threaten to "effectively deprive [plaintiffs] of their…right to practice their profession[] without due process of law," such that "irreparable injury" would follow).

### 4.  *Ongoing Parallel Proceedings Underscore the Irreparability*

It bears emphasizing that Plaintiff's injuries are not speculative or self-inflicted – they are unfolding in real time across multiple fora. Plaintiff has a CPL § 440.10 motion pending to vacate the very conviction being used to suspend him and threaten him with jail. He has filed a CPLR Article 78 proceeding (Index No. 2025-01936) to challenge the official actions restraining his

speech, and he is seeking review in the US Supreme Court of the adverse rulings. These parallel proceedings demonstrate both the serious questions raised about the constitutionality of the underlying conviction and orders, and the pressing need to maintain the status quo until those questions are resolved. Without a TRO, Plaintiff will effectively serve the sentence and suffer the stigma of an unconstitutional conviction before he can be heard on the merits – a classic irreparable harm scenario. Courts do not hesitate to protect a plaintiff from being "punished in the interim for exercising his constitutional rights" because such punishment, once inflicted, cannot later be undone (see *Lozman v. City of Riviera Beach*, 585 U.S. ___ (2018), noting that an official policy of retaliation can be "long term and pervasive" and difficult to dislodge without judicial intervention). Here, the "policy" at issue is the concerted use of legal processes to silence and discredit Plaintiff – a campaign that will succeed in irreversibly chilling his speech, tarnishing his name, and possibly jailing him, unless this Court intervenes.

In sum, Plaintiff has shown far more than the possibility of harm – he is presently enduring irreparable injuries and faces additional imminent harms that are concrete and irretrievable. The reputational destruction, the ongoing suppression of his voice in the "modern public square," and the looming loss of liberty each constitute irreparable harm warranting emergency relief. This Court's immediate intervention is necessary to prevent the status quo from shifting in a way that would extinguish Plaintiff's rights before he can vindicate them. Accordingly, the irreparable harm prong is fully satisfied.

### C. *Balance of Equities*

The balance of hardships tips decidedly in Plaintiff's favor. Absent a TRO, Plaintiff will continue to suffer ongoing violations of core constitutional rights – foremost, a prior restraint on his speech and related due process harms – whereas Defendants will suffer no legitimate injury

from pausing their contested conduct.  When, as here, an injunction will prevent enforcement of measures that likely violate the Constitution, the equities favor the movant.  The government "has no interest in enforcing an unconstitutional law", and Defendants suffer no cognizable harm from being ordered to comply with fundamental rights.  In contrast, Plaintiff faces severe hardship each day his First Amendment freedoms are curtailed.  The Supreme Court has warned that prior restraints are "the most serious and the least tolerable infringement on First Amendment rights".  Each day that the gag orders and de facto censorship remain in effect compounds Plaintiff's injury, silencing his political speech and impairing his ability to engage in public discourse about official misconduct.  This is not merely a personal harm – it is a structural constitutional harm.  By muzzling Plaintiff's speech on matters of public concern, the prior restraint impedes public oversight of government. As the Court observed in *Nebraska Press Ass'n v. Stuart*, public commentary "guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism" *Id*. at 560.  When a court order is used to stifle such scrutiny, it shields the executive's actions from accountability, tipping the constitutional balance out of alignment.  In short, the hardship on Plaintiff's side encompasses not only the loss of his individual liberties, but also an injury to the separation of powers – a harm of the highest order in our democracy.

On the other side of the scales, Defendants will not be unduly prejudiced by the narrowly tailored relief sought.  The requested TRO is purely prohibitory and temporary: it simply restrains Defendants from engaging in specific unlawful acts (such as enforcing a "no-posting" gag clause or using tainted findings obtained through fraud or retaliation) until the Court can adjudicate their legality.  This maintains the status quo ante and prevents irreparable harm; it does not impose any affirmative obligation or undue burden on Defendants. An order requiring the government to stop

doing what the Constitution forbids cannot cause cognizable harm – "no substantial harm" occurs from an injunction that prevents the enforcement of unconstitutional measures. Defendants have no legitimate interest in continuing to enforce a prior restraint or in exploiting findings procured by fraud or retaliation. Equity abhors allowing a litigant to benefit from wrongdoing. Indeed, the Second Circuit has emphasized that fraud on the court – conduct which "does or attempts to defile the court itself" – strikes at the very integrity of adjudication. It is a foundational principle of equity and due process that no party may profit from a judgment obtained through fraud or misconduct. As the Second Circuit explained in *King v. First Am. Investigations, Inc*., 287 F.3d 91, 95 (2d Cir. 2002), "a decision produced by fraud on the court is not in essence a decision at all, and never becomes final." *See also Kupferman v. Consol. Research & Mfg. Corp*., 459 F.2d 1072, 1078 (2d Cir. 1972) (fraud on the court includes the corrupting influence of knowingly making false statements or concealing material facts). In such cases, settled equitable principles demand that courts intervene to nullify the tainted order rather than permit its enforcement. The Southern District of New York has emphasized that the integrity of the judicial process must be protected, and relief is warranted where fraud has undermined that integrity. *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014).

By the same token, if Defendants have procured findings or orders through deception or retaliatory motive, they cannot claim "hardship" from being temporarily barred from using those illicit gains. Simply put, enjoining unconstitutional and tainted actions inflicts no unfair prejudice on Defendants, whereas denying relief would inflict grave and irremediable harm on Plaintiff's constitutional rights.

In sum, the balance of hardships weighs heavily in Plaintiff's favor. Defendants will not be harmed by a TRO that merely requires them to respect constitutional boundaries, whereas

Plaintiff (and the public) would suffer continuing injury from even a momentary perpetuation of the alleged prior restraints and other unlawful practices. The equitable scales, therefore, strongly favor granting the requested relief to halt these violations while the merits are litigated.

## NOTE REGARDING PENDING MOTION FOR
## LEAVE TO AMENDED AND PROPOSED NEW DEFENDANTS

The TRO will not unduly prejudice any proposed new defendants who have not yet been formally added to the case. The Court has authority to bind not only the named parties but also their agents and those in active concert with them who receive notice of the order. The proposed injunction is crafted in compliance with Rule 65(d) to reach the relevant actors without ensnaring any true strangers to the litigation.  Moreover, the order is structured to take effect against newly added parties upon joinder and service, ensuring that those individuals will be subject to the same restraint only after they are properly before the Court and given notice.  This mechanism avoids any "procedural gap" in protection while fully respecting due process: no unjoined party will be bound unless and until they are brought into the suit through the pending amendment and served with process.  In the interim, providing notice of the TRO to the proposed defendants (as Plaintiff has arranged) will simply ensure they are aware of the Court's directive, without prejudicing their rights to later contest the injunction.  Because the TRO is temporary and can be revisited at a preliminary injunction hearing, these soon-to-be defendants suffer no meaningful prejudice from a short delay in using the challenged measures.  By contrast, withholding relief until all defendants are formally joined would effectively reward delay and permit ongoing constitutional injuries. Equity does not demand such a result.  To the contrary, it counsels that the Court act now to preserve the status quo and prevent irreparable harm, confident that doing so harms no one's legitimate interests.

**D.  *Relief Sought in the Public Interest***

Granting the requested TRO serves the public interest by safeguarding not only Plaintiff's First and Fourteenth Amendment rights, but also broader societal values of free expression, accountable governance, and respect for the rule of law.  In First Amendment cases, the public interest and the merits are closely linked: "the Government does not have an interest in the enforcement of an unconstitutional law."  See, e.g., ACLU v. Ashcroft, 322 F.3d 240, 247 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).  Enjoining official action that likely violates the Constitution thus "best serve[s]" the public interest.  Here, the relief sought would advance multiple public interests:

*1.  Protecting Free Expression and Civic Engagement*

The TRO would lift unlawful restraints on Plaintiff's speech about alleged government misconduct – speech that lies at the core of the First Amendment. The Supreme Court has acknowledged that criticisms of public officials rank "high in the hierarchy of First Amendment values" *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018) (citing *Connick v. Myers*, 461 U.S. 138, 145 (1983)), and indeed "has recognized the right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights," *id.* (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quotation marks omitted)).  Robust public commentary on official wrongdoing is indispensable to democratic self-governance.  Yet the facts here show a concerted effort to chill such commentary, converting judicial orders into tools of censorship.  According to the SAC, Defendants "weaponized court orders" by securing "overbroad Protective Seals, 'speech-equals-contact' injunctions, and *de facto gag orders*" – not to protect any legitimate interest, but "to suppress Plaintiff's online speech" and deter others from amplifying his criticism.  Treating public commentary "about" an official as forbidden contact (and even deeming third-party social media reactions to be the speaker's own contact) transformed routine no-contact orders

into prior restraints on core political speech.  The Supreme Court has emphasized the central role of social media and online platforms in modern civic discourse;  the "vast democratic forums of the Internet in general … and social media in particular" are without question "the most important places … for the exchange of views" in today's society.  *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

The Supreme Court has long held that such prior restraints are "the most serious and the least tolerable infringement on First Amendment rights."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  Enjoining Defendants' speech-suppressive tactics will prevent further chill on Plaintiff's and the public's expression.  This in turn preserves an informed citizenry, allowing others to speak out about official misconduct without fear of punitive silencing.  The public interest strongly favors restraint where legal processes may have been used to suppress political speech.  *See Yang v. Kosinski*, 960 F.3d 119, 129 (2d Cir. 2020) (finding the public interest favors a preliminary injunction where, absent the injunction, First Amendment rights forever impaired.).  By halting the enforcement of these gag orders and restraints, the TRO vindicates the public's profound interest in open discourse and civic participation.

2.  *Upholding the Institutional Legitimacy of the Courts*

The public also has a compelling interest in the fair and proper use of judicial processes, an interest undermined when court orders are misused to retaliate against critics.  In this case, government actors allegedly misled multiple courts into issuing orders that silenced Plaintiff's speech and even censored third parties.  For example, the SAC describes how prosecutors persuaded a state judge to issue secret "takedown" orders to social media companies removing posts by non-parties who voiced support for Plaintiff – with no notice or due process for those individuals.  Such *ex parte* censorship of bystanders raises "grave concerns about unconstitutional prior restraint and extrajudicial overreach."  In another incident, immediately after Plaintiff

publicly criticized the District Attorney's Office, a judge (acting on the prosecutors' nearly verbatim submission) scolded Plaintiff for his speech and entered a new no-contact order barring any public social-media comments about prosecutors.  That order effectively equated online criticism with "direct" contact and imposed a sweeping gag on Plaintiff's speech.  These examples illustrate a troubling pattern of courts being co-opted as instruments of personal retribution.  If allowed to stand, such tactics would erode public trust in the judiciary's neutrality and integrity. Conversely, granting relief here will reinforce the courts' legitimacy as guardians of constitutional rights.  The federal judiciary has a duty to intervene where legal processes are perverted to punish dissent.  By enjoining the enforcement of speech-suppressive orders obtained through abuse of process, this Court will affirm that judicial power cannot be hijacked to serve officials' personal agendas.  The public benefits when the courts draw a clear line that their orders and findings cannot be "weaponized" to silence criticism, thereby preserving confidence that the justice system remains impartial and anchored in the rule of law.

As the Supreme Court warned in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, "[t]ampering with the administration of justice … involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public."  322 U.S. 238, 246 (1944).  Courts have uniformly rejected attempts to benefit from misconduct that corrupts judicial proceedings. When such corruption is credibly alleged and constitutional review is pending, judicial restraint is not only appropriate—it is required in the public interest.  The public interest strongly favors restraint where prior processes may have functioned to silence political speech. *See Yang v. Kosinski*, 960 F.3d 119, 129 (2d Cir. 2020) (public interest favors vindication of First Amendment rights).  Judicial deference to facially suspect proceedings risks compounding constitutional harm and undermining public trust in the fairness of civil adjudication.

### 3. _Separation of Powers and Democratic Accountability_

The broader public interest at stake transcends this case, implicating fundamental checks and balances.  Our constitutional system entrusts the judiciary to check executive or prosecutorial excesses, especially when fundamental rights are at risk.  Here, Plaintiff's ordeal exemplifies a systemic danger: if government actors can collude to stifle a critic by exploiting legal formalities (protective orders, probation terms, prosecutorial findings), then official misconduct is shielded from scrutiny and other citizens will be deterred from coming forward.  This offends democratic accountability, which depends on the People's ability to call out and correct government abuse.  Courts must be especially vigilant to provide a remedy in such cases, lest public officials learn that they can systematically muzzle dissenters with impunity.

The specific harms Plaintiff has suffered – including alleged fabrication of evidence, selective enforcement, and gag orders aimed at his criticism – are not only personal injuries but alarm bells for the wider community.  They signal what could befall any citizen who challenges powerful figures, unless the judiciary intervenes.  Granting the TRO will thus serve the structural public interest by reasserting separation-of-powers boundaries (the Court checking executive misuse of power) and by ensuring democratic transparency (exposing, rather than concealing, official wrongdoing).

### E. **_Bond_**

Rule 65(c) security is discretionary. Courts routinely waive or set nominal bonds in civil-rights matters and for indigent plaintiffs where an injunction serves the public interest. See _Doctor's Assocs., Inc. v. Stuart_, 85 F.3d 975, 985 (2d Cir. 1996) (district courts have wide discretion under Rule 65(c)).  Plaintiffs proceed IFP; a bond would chill access to judicial review.

## V.    __FEDERAL INTERVENTION IS PROPER__

Federal intervention is warranted under all three recognized exceptions to *Younger*: (1) the orders were issued in bad faith and are being used to harass; (2) the gag and enforcement orders are patently unconstitutional on their face; and (3) no adequate remedy is available in state court.

### A.  ___The Prior Orders Are Being Used in Bad Faith and to Harass___

Plaintiff was prosecuted for reposting screenshots, satire, and commentary on prosecutorial racism, double standards, and public safety.  The sealed and gagged nature of the proceeding—coupled with the strategic concealment of evidence, prosecutorial coordination with family court counsel, Annie Seifullah, and the continued weaponization of the findings in *Putnam v. Perry*—demonstrate a clear pattern of retaliatory abuse of process.

Call notes and internal emails from April 2021, further reinforce the inference of retaliatory motive and constitutional infirmity.  Call notes from an April 30, 2021 conversation between ADA Alexandra Wynne and private counsel Annie Seifullah (See Exhibit R of the SAC) confirm that Ms. Putnam's concern was not personal safety, but reputational harm stemming from the public perception of being labeled a "*Karen*"—a pejorative shorthand for a white woman leveraging racial privilege to target Black men.  This reputational fear, not any legitimate threat of harm, served as the animating concern behind the civil and criminal complaints.

In a separate email exchange dated April 8, 2021 (See Exhibit S of the SAC), ADA Wynne and colleagues expressly acknowledged that Plaintiff's posts were not criminal threats or harassment, but rather speech "analogous to bullying or calling someone racist online."  The prosecutors even suggested the DA's Office should refer the matter to Facebook or Instagram for potential takedown, recognizing that the content did not meet the threshold for criminal enforcement.  These communications undermine any claim of good-faith prosecutorial conduct

and confirm that the proceedings were instituted not to protect physical safety but to suppress political speech and insulate Putnam from reputational fallout.

These disclosures corroborate third-party declarations—such as that of Alyssa Rowe—stating that Ms. Putnam's central concern was her career, not her safety. Together, these facts underscore the improper motive behind the initial prosecution and the ongoing family court enforcement, warranting federal intervention under *Younger*'s bad faith and harassment exceptions. See *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994) (injunctive relief warranted where state process is used to retaliate against constitutionally protected expression).

Since October 2024, Plaintiff has publicly reposted all material at issue, deliberately informed prosecutors, and since engaged in additional public commentary. The People's complete inaction—despite repeated republication and notice—strongly suggests abandonment of the initial rationale for the orders, reinforcing the inference that they were imposed not for public safety but to silence criticism and chill speech. This key fact was presented in the May 12, 2025 motion to renew, and remains undisputed. *See Cullen* at 103 (2d Cir. 1994) (refusal [of a federal court] to abstain is also justified where a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass). *See also Lewellen v. Raff*, 843 F.2d 1103, 1109-10 (8th Cir. 1988) (injunction justified regardless of expectations where prosecution brought to discourage exercise of constitutional rights). Abstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, *see, e.g., id*. at 1110, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings. *See also Rowe v. Griffin*, 676 F.2d 524 (11th Cir. 1982) (bad faith prosecution where brought after assurances of immunity to defendant). *See also Netflix, Inc. v.*

*Babin*, 88 F.4th 1080 (5th Cir. 2023) (affirming injunctive relief where prosecution lacked good-faith basis and chilled protected speech).

Moreover, the underlying state prosecution treated Plaintiff's expressive acts—satirical captions, reposts, and commentary—as evidence of intent to harass or threaten.  But to the extent that such charges require the alleged victim to have felt fear or distress, the law invites manipulation.  Emotion, unlike action, is subjective and can be easily performed, feigned, or exaggerated—particularly where litigation incentives exist.  *See Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas themselves are offensive to some of their hearers.").

Indeed, the People's case relied heavily on inferences about Plaintiff's motives and selectively curated exhibits.  But as alleged in the SAC, the factual record itself was manipulated—through sealing orders, selective disclosures, and strategic concealment of exculpatory communications.  The result was a distorted factual narrative in which protected political speech was reframed as criminal conduct.  This makes prosecutions like Plaintiff's uniquely susceptible to abuse, and the resulting orders uniquely fragile under constitutional scrutiny.

### B.  *The Orders Are Patently Unconstitutional on Their Face*

At sentencing, the state court explicitly prohibited Plaintiff from "any comments on social media," stating, "That is not free speech anymore" (Sentencing Tr. 50).  This sweeping restriction on expressive content—without tailoring, without notice, and without any hearing—constitutes a textbook prior restraint.  "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976).

There is no permissible basis under strict scrutiny for enjoining broad public commentary regarding law enforcement and public actors. The gag order, on its face, criminalizes protected expression, and should be enjoined. The sentencing court's absolute prohibition—'that is not free speech anymore'—is not merely overbroad; it is a paradigmatic example of a prior restraint imposed without findings or justification.

Despite the above posturing, Plaintiff has notified the Court and District Attorney's Office of the republication of all prior posts across platforms such as Instagram and TikTok. These postings, which include content alleged to be criminal in the underlying prosecution, have not resulted in any enforcement action or contempt proceeding—further indicating that the state no longer considers such speech criminal. These uncontested republications were detailed in the state court's May 12, 2025 motion to renew.

Recent Supreme Court decisions, including *Lindke v. Freed*, 601 U.S. ___ (2024), and *O'Connor-Ratcliff v. Garnier*, 601 U.S. (2024), reaffirm that state actors may not suppress speech on social media simply because it is critical or politically inconvenient. These precedents, cited in Plaintiff's state motion, confirm that the orders challenged here are unconstitutional in both intent and effect.

### C.  *There Is No Adequate Remedy in State Court*

Plaintiff has exhausted all plausible state remedies, to no avail.

- a leave to application to the New York State Court of Appeals (CLA 2024-00995) was denied;

- a pending CPL § 440.10 motion—filed December 2, 2024, raising constitutional challenges to the underlying conviction—remains undecided;

- A pending CPLR Article 78 proceeding; cannot enjoin the underlying conviction.

This procedural purgatory deprives Plaintiff of meaningful review. As the Supreme Court held in *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973), and *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982), *Younger* abstention is inappropriate where the state forum does not provide "timely and certain" relief.

Plaintiff's efforts to engage the trial court underscore the point. On May 20, 2025, Plaintiff sent an email directly to Hon. Abraham Clott, clarifying that he was not seeking a ruling on the CPL § 440.10 motion, but merely a determination as to the continued validity of the gag orders. Despite that focused, good-faith request, and a detailed prior motion filed on May 12, the court has taken no action. This silence, despite repeated public republication and ample notice to the District Attorney, constitutes a constructive denial of constitutional redress.

In these circumstances, federal courts must not stand idle. *Steffel v. Thompson*, 415 U.S. 452, 462 (1974), confirms that federal relief is proper even without an active prosecution, where irreparable constitutional harm is imminent.

## VI.    <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff has shown (i) ongoing and irreparable deprivation of core constitutional rights (First, Fourth, Sixth, and Fourteenth Amendments), (ii) at least a likelihood of success—or, at minimum, serious questions with the balance of hardships tipping decidedly in his favor—and (iii) that narrowly tailored relief will preserve the *status quo* without harming any legitimate governmental interest. Immediate intervention is necessary to prevent further prior restraint, retaliatory process, unlawful use of seized data, and due-process violations in collateral fora.

Consistent with Rule 65 and as set out in the attached [Proposed] Order to Show Cause, Plaintiff respectfully asks the Court to:

- **Enjoin the "speech-equals-contact" prior-restraint regime**: prohibit enforcement or threat of enforcement of any no-posting/no-contact/protective/probation order that treats Plaintiff's public, non-threatening social-media speech as prohibited "contact" (without prejudice to enforcement against true threats, unlawful harassment, or other unprotected speech).

- **Restore access to evidence**: temporarily lift/modify CPL § 245.70 restrictions so Plaintiff may personally inspect, copy, and reasonably search discovery needed for his CPL § 440.10 motion and this action; require a short-deadline log identifying items still claimed to be sealed and the basis.

- Stay retaliatory collateral enforcement: bar Family Court/probation applications or contempt premised on Plaintiff's protected public speech, including any theory that third-party reactions to public posts constitute "indirect contact."

- **Prevent preclusive use of non-final criminal findings**: prohibit reliance on, or invocation of preclusion from, non-final findings/statements from People v. Perry, Ind. No. 01389/21 in any civil, Family Court, or disciplinary matter absent an independent evidentiary review with contemporaneous access and a meaningful opportunity to respond.

- **Impose AGC due-process guardrails (Ex parte Young)**: (i) no reliance on non-final criminal findings or undisclosed/withheld materials; (ii) timely, personal access for Plaintiff to any evidence used against him with reasonable safeguards; and (iii) no asymmetric gag/confidentiality practices that silence Plaintiff while permitting one-sided publication.

- **Identify, segregate, and cease use of seized data**: require Defendants to identify all data obtained via challenged warrants, segregate it, cease any use or disclosure, and file a short-deadline certification detailing locations, scope, dissemination, and chain-of-custody, pending further order.

- **Protect Beulah Perry's confidential records**: require identification, cessation of use, return or secure destruction of any FBI "rap sheet" or other confidential records, with certification and notice to any third parties who received them.

- **Suspend platform takedowns of protected speech without process**: prohibit requests/directives to platforms to remove, suppress, or throttle protected content concerning this controversy without prior notice and a prompt, neutral opportunity to be heard (independent of platform removal of unprotected speech).

- **Bind those in active concert and prevent evasion**: bind existing parties and those acting in active concert with actual notice under Rule 65(d)(2); include a non-interference clause forbidding novel re-definitions that re-label public commentary as prohibited "communication."

- **Preserve evidence**: require immediate litigation holds and preservation of documents/ESI, including logs and internal chats.

- **Service and security**: given Plaintiff's IFP status, direct service by the Clerk/U.S. Marshals (and authorize reasonable alternative service if needed) and set security at $0.

- And grant such other and further relief as the Court deems just and proper.

This limited, temporary relief merely halts ongoing constitutional injuries until the Court can adjudicate the merits. Plaintiff respectfully requests that the Court issue the Temporary

Restraining Order forthwith and enter the [Proposed] Order to Show Cause, preserving the status quo and protecting Plaintiff's constitutional rights pending further proceedings.

Dated: September 9, 2025
      New York, New York

                          William Perry
                          Plaintiff, *pro se*
                          210 East 36th Street
                          New York, NY 10016
                          wdperry@gmail.com
                          954-802-1334

Attached:     Supplemental Letter Application to Hon. Judge Clott, New York Supreme Court, New York County, New York, re: People v. Perry (Indictment No. 01389/21), dated June 16, 2025

**Exhibit A**

Supplemental Submission, Judge Clott, Part 94, New York Supreme Court,
New York County, People v. Perry_01389-21_6-16-2025

June 16, 2025

The Hon. Abraham Clott, Part 94
Supreme Court of the State of New York, Criminal Term
City of New York, New York County
100 Centre Street
New York, NY 10013

   **RE:** ***People v. Perry*, Ind. No. 01389/21;**
     **Request for Judicial Action on Previously Filed Motion (CPLR § 2221(e))**

Dear Judge Clott:

   I write to respectfully follow up on my June 5, 2025 supplemental submission re: a May 12, 2025 Motion to Renew pursuant to CPLR § 2221(e) re: First Amendment Violative Order(s) in *People v. Perry*, Ind. No. 01389/21. That submission also attached a proposed form motion for federal injunctive relief, outlining concerns about ongoing constitutional violations tied to those orders.

   I have since followed up with your court attorney, but have not received any indication as to whether the Court intends to schedule further briefing or issue a ruling on the motion. I now write directly to Your Honor as a final courtesy before pursuing the contemplated relief in federal court.

   Additionally, I note for the Court's awareness that over this past weekend, I posted publicly to social media in a manner similar to the posts that were previously the subject of judicial restriction. These posts included references to the pending Stalking Horse motion and to the Court itself. As of this writing, I have not been arrested, contacted by law enforcement, or informed that the People have brought the matter to Your Honor's attention. This silence underscores that such posts are not criminal, threatening, or unlawful, and further supports my position that the speech at issue is constitutionally protected.

   To that end, I wish to clarify that my social media references to the Court were intentionally made in a mocking tone—many employing humor and cultural references to Monty Python. This was not done to gratuitously insult the Court, but rather to illustrate the absurdity of interpreting public condemnation, ridicule, or satire as threatening. In selecting Monty Python, I deliberately invoked a cultural touchstone likely familiar to the Court given Your Honor's generation, in order to ensure the critique was accessible and intelligible.

   The point is this: public actors—whether judges or prosecutors—are not entitled to insulation from criticism, satire, or shame when implicated in misconduct or violations of rights. The Court is no more entitled to protection from public condemnation for infringing on constitutional rights than ADA Mark A. Monaco is entitled to protection from being called a bigot in a public forum.

1

For the Court's convenience, I respectfully note that the following matters remain pending before Your Honor:

- **May 12, 2025** – Motion to renew and modify prior protective/gag orders pursuant to CPLR § 2221(e);
- **May 16, 2025** – Subpoena request for evidence within related family court matter;
- **May 16, 2025** – Motion to renew regarding access to sealed and unredacted evidence obtained in discovery; and
- **May 27, 2025** – Motion to recuse ADA Virginia Nguyen, and the Manhattan DA.

I would appreciate any guidance the Court can provide as to whether action on any of these matters is forthcoming.  Absent a response within 36 hours, I will proceed on the understanding that no further action is anticipated and will move forward accordingly in federal court.

Respectfully submitted,

Dated: June 16, 2025
     New York, New York

William Perry
Defendant, *pro se*
210 East 36th Street
New York, NY 10016
954.802.1334
wdperry@gmail.com

**Enclosure**:

| | | |
|---|---|---|
| **(1)** | Email to the People, providing notice of Instagram Post re: Judge Clott and Pending Stalking Horse Motion, dated June 14, 2025; |
| **(2)** | Supplemental Submission, dated June 5, 2025, including DRAFT Stalking Horse Motion for Injunctive Relief, *Perry v. Monaco et al.* 24CV8736;[1] |
| **(3)** | Motion to Renew and Modify Order Violated of First Amendment, dated May 12, 2025;[1] |
| **(4)** | Motion to Renew and Modify Order Restricting Defendant's Access to Evidence, dated May 16, 2025; [1] |
| **(5)** | Subpoena for evidence within related family court matter, dated May 16, 2025;[1] and |
| **(6)** | Motion to recuse ADA Virginia Nguyen, and if necessary, the Manhattan District Attorney's Office, dated May 27, 2025,[1] |
| **(a)** | Supplemental Submission in Support of Motion to Recuse, dated June 1, 2025.[1] |

TO:    'Hon. Abraham Clott' aclott@nycourts.gov; 'Albert DiGiulio' adigiuli@nycourts.gov; 'Felisha Halwick' fhalwick@nycourts.gov; part94@nycourts.gov.

CC:    LimanNYSDChambers@nysd.uscourts.gov; USANYS-CivilRights@usdoj.gov.

---

[1] Incorporated by reference, pursuant to NY CPLR 3014.

Supreme Court of the State of New York
City of New York, New York County
100 Centre Street
New York, NY 10013

Alvin Bragg
District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

Lisa DelPizzo
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

Alan Gadlin
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

Virginia Nguyen
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

Hannah Perlman
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

David Laurent Gagne
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

**From:** William Perry
**To:** Virginia Nguyen
**Cc:** bragga@dany.nyc.gov; delpizzol@dany.nyc.gov; Alan Gadlin; Hannah Perlman; David Gagne
**Subject:** Re: People v. Perry, Ind. 01389/2021
**Date:** Saturday, June 14, 2025 10:21:40 PM

FYI,



Mark A Manco Cover Up Page on Instagram: "Waiting on Judge Clott to respond to the Stalking Horse Motion. #ComingSoon"
instagram.com

Sent from my iPhone

> On Jun 5, 2025, at 10:37 PM, William Perry <wdperry@gmail.com> wrote:

FYI,

<504460828_180599161462400

Mark A Manco Cover Up Page on Instagram: "It's not the crime… it's the Mark A Monaco Cover Up. #Mark_A_Monaco #Cover_Up #Mark_Of_Shame #MAM_CoverUp"
instagram.com

Sent from my iPhone

> On Jun 5, 2025, at 1:58 PM, wdperry@gmail.com wrote:

With filing receipt, affidavit of service, and statement pursuant to CPLR
2106.

Best,
Will

**William D. Perry, *Esq*.**
New York University School of Law, 2012
University of Florida, BSBA 2009
954.802.1334
wdperry@gmail.com

---

**From:** wdperry@gmail.com <wdperry@gmail.com>
**Sent:** Thursday, June 5, 2025 1:31 PM
**To:** 'Virginia Nguyen' <NguyenV@dany.nyc.gov>
**Cc:** bragga@dany.nyc.gov; delpizzol@dany.nyc.gov; 'Alan Gadlin'
<GADLINA@dany.nyc.gov>; 'Hannah Perlman'
<PerlmanH@dany.nyc.gov>; 'David Gagne' <gagned@dany.nyc.gov>
**Subject:** RE: People v. Perry, Ind. 01389/2021

Good Afternoon People,

Please see attached correspondence addressed to Judge Clott regarding
the prior filed May 12, 2025 motion to renew, pursuant to CPLR §
2221(e). The attached seeks judicial action on previously filed motion.

Best,
Will

**William D. Perry, *Esq*.**
New York University School of Law, 2012
University of Florida, BSBA 2009
954.802.1334
wdperry@gmail.com

---

**From:** wdperry@gmail.com <wdperry@gmail.com>
**Sent:** Sunday, June 1, 2025 12:50 AM
**To:** 'Virginia Nguyen' <NguyenV@dany.nyc.gov>
**Cc:** bragga@dany.nyc.gov; delpizzol@dany.nyc.gov; 'Alan Gadlin'
<GADLINA@dany.nyc.gov>; 'Hannah Perlman'
<PerlmanH@dany.nyc.gov>; 'David Gagne' <gagned@dany.nyc.gov>
**Subject:** RE: People v. Perry, Ind. 01389/2021

See attached.

**William D. Perry,** *Esq.*
New York University School of Law, 2012
University of Florida, BSBA 2009
954.802.1334
wdperry@gmail.com

---

**From:** wdperry@gmail.com <wdperry@gmail.com>
**Sent:** Tuesday, May 27, 2025 6:11 PM
**To:** 'Virginia Nguyen' <NguyenV@dany.nyc.gov>
**Cc:** bragga@dany.nyc.gov; delpizzol@dany.nyc.gov; 'Alan Gadlin'
<GADLINA@dany.nyc.gov>; 'Hannah Perlman'
<PerlmanH@dany.nyc.gov>; 'David Gagne' <gagned@dany.nyc.gov>
**Subject:** RE: People v. Perry, Ind. 01389/2021

With the Affidavit of Service attached.

Best,
Will

**William D. Perry,** *Esq.*
New York University School of Law, 2012
University of Florida, BSBA 2009
954.802.1334
wdperry@gmail.com

---

**From:** wdperry@gmail.com <wdperry@gmail.com>
**Sent:** Tuesday, May 27, 2025 5:52 PM
**To:** 'Virginia Nguyen' <NguyenV@dany.nyc.gov>
**Cc:** bragga@dany.nyc.gov; delpizzol@dany.nyc.gov; 'Alan Gadlin'
<GADLINA@dany.nyc.gov>; 'Hannah Perlman'
<PerlmanH@dany.nyc.gov>; 'David Gagne' <gagned@dany.nyc.gov>
**Subject:** People v. Perry, Ind. 01389/2021

Evening,

Please see attached.

**William D. Perry,** *Esq.*
New York University School of Law, 2012
University of Florida, BSBA 2009

954.802.1334
wdperry@gmail.com


<mime-attachment>
<Supplemental Submission_People v. Perry_01389_21_June 5,
2025_EXE.pdf>

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY:  PART 94**
-----------------------------------------------------------------X

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | STATEMENT PURSUANT TO CPLR 2106 |
| - against - | |
| | IND. NUMBER:  01389/21 |
| WILLIAM PERRY, | |
| Defendant. | |

-----------------------------------------------------------------X

<u>**STATEMENT PURSUANT TO CPLR 2106**</u>

I affirm this <u>16th</u> day of <u>June</u>, <u>2025</u>, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: June 16, 2025

_____
William Perry
Defendant
210 East 36th Street
New York, NY 10016
wdperry@gmail.com

**Enclosure**:  **(A)**    Supplemental Submission Regarding Prior Request for Judicial Action, dated June 16, 2025, with the following attachments:

           **(1)**    Email to the People, providing notice of Instagram Post re: Judge Clott and Pending Stalking Horse Motion, dated June 14, 2025;

.

To:    Supreme Court of the State of New York
City of New York, New York County
100 Centre Street
New York, NY 10013

Alvin Bragg
District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013
Lisa DelPizzo
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

Alan Gadlin
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

Virginia Nguyen
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

Hannah Perlman
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

David Laurent Gagne
Assistant District Attorney
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013

**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY: PART 94**
-------------------------------------------------------------------X
**THE PEOPLE OF THE STATE OF NEW YORK**          AFFIDAVIT OF
                                                  SERVICE BY EMAIL

          - against -                            Ind. Number: 01389/21

**WILLIAM PERRY**
                          **Defendant.**
-------------------------------------------------------------------X

STATE OF NEW YORK)
COUNTY OF NEW YORK) ss.:


    William Perry, being duly sworn, deposes and says that he is a party to this action, is over 18 years of age, and resides at 210 East 36th Street, Apt. 10A, New York, NY. That on the day of June 16, 2025, I, Defendant, pursuant to 22 NYCRR 1250.4(b)(2), supplied the People, via email, a true copy of the following document(s) at the below date/time:

-   **Supplemental Submission Follow Up**, dated June 16, 2025, delivered between approximately 10:52 AM EST and 11:03 AM EST on June 16, 2025, across four (4) separate emails.

### STATEMENT PURSUANT TO CPLR 2106

    I affirm this 16th day of June, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.


William Perry
Defendant
210 East 36th Street
New York, NY 10016
954-802-1334
wdperry@gmail.com