USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:________________
DATE FILED: 09/30/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

WILLIAM PERRY, et al.,

Plaintiffs,

-v-

MARK ANTHONY MONACO, et al.,

Defendants.

---------------------------------------------------------------------X

24-cv-8736 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants the City of New York (the "City"), and Alvin Bragg ("Bragg"), Mark Monaco ("Monaco"), Lisa Del Pizzo ("Del Pizzo"), Stuart Silberg ("Silberg"), Erin Tierney ("Tierney"), Shira Arnow ("Arnow"), Alexandra Wynne ("Wynne"), Hannah Perlman ("Perlman" and with Bragg, Monaco, Del Pizzo, Silberg, Tierney, Arnow, and Wynne, the "ADA Defendants"), Thomas Mullins ("Mullins") and Donjya Bardliving ("Bardliving") (collectively, "Individual Defendants" and with the City, "Moving Defendants") move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Revised Second Amended Complaint ("RSAC") of Plaintiff William Perry ("Plaintiff"). Dkt. No. 140.

For the following reasons, the motion to dismiss is granted.

**BACKGROUND**

For purposes of this motion, the Court accepts as true the well-pleaded allegations of the RSAC as supplemented by the documents attached to the RSAC, or of which the Court can take judicial notice, or that are incorporated by reference. The narrative set out below "do[es] not reflect the Court's own findings" but simply repeats the account of events stated by Plaintiff in his Revised Second Amended Complaint. *Brown v. Maxwell*, 929 F.3d 41, 52 (2d Cir. 2019). At

this stage of the proceedings, the Court has not considered whether those allegations are true. The Court describes only those allegations relevant to the Moving Defendants.

This case grows out of three criminal prosecutions against Plaintiff in New York State Supreme Court, New York County: (1) a prosecution following a March 17, 2019 arrest that concluded when Plaintiff pled guilty to one count of disorderly conduct and was sentenced to one-year conditional discharge and restitution of $315, Dkt. No. 141 ¶ 2; Dkt. No. 141-1; (2) a prosecution following a September 24, 2020 arrest on charges of aggravated harassment in the second degree and criminal contempt in the second degree, Dkt. No. 131 ("RSAC") ¶ 52; Dkt. No. 126-2 at 27–31,[1] and (3) a prosecution following a May 14, 2021 arrest that resulted in a conviction of two counts of criminal contempt in the second degree (P.L. § 215.50), three counts of stalking in the fourth degree (P.L. § 120.45(1), and one count of harassment in the first degree (P.L. § 240.25) following a jury trial, RSAC ¶ 104; Dkt. No. 141-2.[2] On April 24, 2023, Plaintiff was sentenced to three years' probation. *Id.* Plaintiff is an individual who resides in New York, New York and was the subject of the prosecutions. *Id.* ¶ 9.

Bragg is the elected District Attorney for New York, New York. *Id.* ¶ 12. Monaco, Del Pizzo, Silberg, Tierney, Arnow, Wynne, and Perlman are Assistant District Attorneys ("ADAs") in the New York County District Attorney's Office (the "DA's Office"). *Id.* ¶¶ 11, 13. Mullins and Bardliving are investigators employed by the DA's Office. *Id.* ¶ 14.[3]

---

[1] These charges remained pending upon Plaintiff's May 14, 2021 arrest. Plaintiff does not specifically allege how these charges were resolved. Dkt. No. 126-2 at 22; Dkt. No. 141 ¶ 3; Dkt. No. 141-2.

[2] The Court takes judicial notice of relevant matters of public record. *See, e.g.*, *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); *Shmueli v. City of New York*, 424 F.3d 231, 233 (2d Cir. 2005).

[3] Plaintiff also has named as defendants Hannah Putnam ("Putnam"), Alyssa Rowe ("Rowe"), Annie Seifullah ("Seifullah"), Rosemarie Monaco ("Rosemarie"), Hon. Curtis Farber ("Farber"), Hon. Ruth Pickholz ("Pickholz"), Hon. Josh Hanshaft ("Hanshaft"), Hon. Abraham Clott

## I. 2019 Prosecution

In July of 2018, Plaintiff and his then-girlfriend, Hannah Putnam ("Putnam"), ended their relationship. *Id.* ¶ 33. Putnam removed her belongings from Plaintiff's apartment between July 21, 2018, and July 31, 2018. *Id.* Two weeks after the relationship ended, on August 4, 2018, Putnam struck Plaintiff in the face and threatened to involve law enforcement if she was not permitted continued access to Plaintiff's residence. *Id.* ¶ 33. Plaintiff began recording the incident, which he alleges shows "Putnam feigning distress—yelling and placing herself on the floor to create a disturbance." *Id.* Plaintiff reported Putnam to the police. *Id.*; *see* Dkt. No. 126-1 at 2–5.[4]

Plaintiff and Putnam reconciled in late 2018 and Putnam moved back into his apartment on January 1, 2019. RSAC ¶¶ 33–34. Plaintiff claims that, on March 16, 2019, Putnam struck Plaintiff, accused him of abuse, and threatened to call the police. *Id.* ¶ 34. Plaintiff, who identifies as a Black man, "feared the encounter's consequences" due to his "aware[ness] of common policing biases." *Id.*; *see also id.* ¶ 223. Plaintiff alleges that Putnam is white. *Id.* ¶ 225. During this dispute, Putnam photographed Plaintiff as his back was turned towards her and threatened to portray the discussion as "forced sex." *Id.* ¶ 35. Plaintiff and Putnam argued, and Putnam's phone screen was incidentally broken. *Id.* ¶ 35.

On March 17, 2019, Plaintiff was arrested on charges brought by the DA's Office. Dkt. No. 141-1. Monaco was assigned to prosecute the case. *Id.* ¶ 36. During the course of the prosecution, Monaco warned Putnam that making a false statement to the police is a crime. *Id.*

---

("Clott"), Hon. Jacob Maeroff ("Maeroff"), Hon. Joseph A. Zayas ("Zayas"), Hon. Karen Lupuloff ("Lupuloff"), Jorge Dopico ("Dopico"), and Raymond Vallejo ("Vallejo"). *Id.* ¶¶ 16–27. Those defendants have not been served, have not appeared in the case, and are therefore not referred to as Defendants herein.

[4] The exhibits to the RSAC appear at Dkt. No. 126. Citations to the exhibits use ECF pagination.

(alleging that Monaco stated: "you know it's a crime to make a false statement to the police."). Plaintiff provided the August 4, 2018 video to Monaco. *Id.* ¶ 37. Plaintiff alleges that Monaco was informed that Putnam sought dismissal of the charges, *id.* ¶ 38, and that Monaco admitted receiving a thumb drive with texts that allegedly showed Putnam's desire to dismiss the case, her efforts to contact Plaintiff, and her negative assessment of Monaco's intelligence, *id.* ¶ 40. *See also id.* ¶¶ 39–40 (alleging that Putnam sent repeated messages demanding contact with Plaintiff); Dkt. No. 126-1 at 7–14 (screenshots of texts from Putnam). Monaco still advanced the charges and arranged a proffer with Plaintiff that focused on Plaintiff's career, education, and family obligations. *Id.* ¶ 37. Plaintiff alleges that he understood the proffer "as implicit leverage against his livelihood and ability to support his aged parents." *Id.*

Plaintiff pled guilty to one count of disorderly conduct in violation of Penal Law § 240.20 on January 6, 2020. *Id.* ¶ 40; Dkt. No. 141 ¶ 2; Dkt. No. 141-1. He alleges that he did so because Putnam fed Monaco selective snippets of interactions she had initiated and because he was threatened with additional charges tied to purported protective-order violations. RSAC ¶ 40. He was sentenced to one-year conditional discharge and restitution in the amount of $315. Dkt. No. 141-1. The court, under Judge Keshia J. Espinal, also issued an order of protection which remained in effect until January 5, 2022 ("Order of Protection"). Dkt. No. 126-2 at 31. The order directs Plaintiff (identified as the "defendant") to refrain from communication or contact with Putnam by mail, telephone, email, voicemail, or any other means (electronic or otherwise), and to refrain from intimidation, threats, menacing or any criminal offense against Putnam. *Id.*

## II. 2020 Prosecution

Following Plaintiff's January 6, 2020 conviction, Plaintiff publicly posted about Putnam on social media on multiple occasions. *See* RSAC ¶¶ 46–47 (noting that Putnam's counsel planned to prepare a list of posts); Dkt. No. 126-2 at 37–49 (screenshots of posts from May and

August 2020). In particular, on or about March 3, 2020, Plaintiff posted the August 2018 videos of Putnam to Instagram and TikTok. RSAC ¶ 41. In response, Putnam contacted Monaco, who declined to press charges. *Id.* Putnam also hired private attorney Annie Seifullah ("Seifullah") who sent a cease-and-desist letter to Plaintiff on May 28, 2020, *id.* ¶ 42, and initiated a case in family court, which issued a temporary order of protection in August 2020, *id.* ¶¶ 41–43.

On September 24, 2020, Plaintiff was arrested on an arrest warrant. *Id.* ¶¶ 52, 52 n.16. Plaintiff alleges that his arrest was based on a novel theory of professional retaliation based on the notion that his postings threatened Putnam's employment, which provided no basis for an arrest and prosecution. *Id.* ¶ 53. He additionally asserts that Monaco was improperly motivated by retaliation. *Id.* ¶¶ 52–53. The day before Plaintiff's arrest, Plaintiff made public two Instagram accounts that documented what he claimed was Monaco's misconduct. *Id.* ¶ 52. Plaintiff alleges that Monaco intentionally removed the "retaliatory context" from the prosecution by omitting information about Plaintiff's posts from the charging materials and concealing that information from superiors. *Id.* ¶ 54. Monaco later admitted that "concern he was being publicly cast as a racist" motivated his decision-making. *Id.* ¶ 54 (citing to trial transcript).[5]

Shortly following his arrest, on October 7, 2020, Bardliving swore out a misdemeanor complaint against Plaintiff, charging him with criminal contempt in the second degree in violation of Penal Law § 215.50(3) and aggravated harassment in the second degree in violation

[5] Plaintiff additionally alleges that Monaco tampered with evidence by not producing a grievance letter referencing Monaco's misconduct. RSAC ¶ 55. Monaco testified that he remembered receiving a cover sheet but could not recall the grievance letter itself and that he was not aware of any actual complaint. *Id.* ¶ 55, n.19. Plaintiff makes no allegations as to the content of the alleged grievance letter or the nature of the complaint.

of Penal Law § 240.30(1)(b). Dkt. No. 126-2 at 27–31.[6] The complaint was based on the Order of Protection that Judge Espinal had issued at the end of Plaintiff's 2019 criminal case, which directed Plaintiff to refrain from communications or contact with Putnam and to refrain from intimidating, threatening, menacing, or engaging in any criminal offense against Putnam. *Id.* at 31. The complaint charged that by posting messages publicly on Instagram and TikTok directed to and about Putnam, Plaintiff had violated the Order of Protection. *Id.* Specifically, in April 2020, Plaintiff had created an Instagram account using Plaintiff's likeness and videos of her with the username hcputnam. *Id.* at 27–29. Plaintiff had posted at least six videos depicting Putnam to TikTok. *Id.* He had also posted messages on the Instagram account, stating in one instance, "Some people get so use [sic] to lying, they say shit that's blatantly not true," and in another (from July 2020), "Summer 2020. Truth always finds the light. A story about fraud, privilege and abuse of power. Inspired by the podcast Serial." *Id.* at 28. The misdemeanor complaint invoked the harm-to-employment theory. Bardliving reported that he was informed by Putnam that Plaintiff's conduct had caused Putnam "substantial emotional harm in that it has caused [her] to fear for her physical safety and to fear that her employment is threatened due to the defendant's public postings and to fear that the defendant will continue to disclose her personal information, videos, and images of her on the aforementioned Instagram and TikTok profiles." *Id.* at 31. Plaintiff was arraigned on the complaint on October 7, 2020. Dkt. No. 126-2 at 47.

---

[6] Plaintiff labels the October 7, 2020 affirmation as an "arrest affidavit." *See* Dkt. No. 126-2 at 27. However, he alleges that he was arrested on September 24, 2020, and the document itself is not identified as an arrest warrant. RSAC ¶¶ 52, 52 n.16. Instead, it outlines the charges against Plaintiff and provides the factual basis for those charges, in line with the structure of a misdemeanor complaint. C.P.L. § 100.15(1) (requiring that a misdemeanor complaint contain "an accusatory part and a factual part" and "must be subscribed and verified by a person known as the 'complainant'"); *see also People v. Cruz*, 750 N.Y.S.2d 422, 423 (2d Dep't 2002) (noting that the criminal action was commenced by the filing of a misdemeanor complaint).

## III. Monaco's Removal from Plaintiff's Prosecution

In March or April 2021, Plaintiff published posts on social media alleging that Monaco had initiated Plaintiff's September 2020 arrest in furtherance of a coverup. RSAC ¶¶ 61–62; *see, e.g.*, *id.* ¶ 61 (noting that Plaintiff's posts "include hashtags such as #Mark_A_Monaco, #MAMCoverUp, and #Mark_Of_Shame"). That same month, Plaintiff posted messages about Monaco's mother, Rosemarie Monaco ("Rosemarie"). *Id.* ¶¶ 58, 63. Those included posts that featured images of Monaco and Rosemarie, "captioned with harassing words." *Id.* ¶ 58 (quoting from arrest warrant).

Monaco was subsequently removed from the investigation and prosecution of Plaintiff on March 19, 2021. *Id.* ¶¶ 56–59, 61, 64. ADA Arnow, Monaco's supervisor, testified that the August 2020 criticism of Monaco was not alarming and prompted no reassignment, investigation, or safety measures. *Id.* ¶ 62. Arnow testified that, in contrast, the post of Monaco's mother was "startling" and "the factor" for Monaco's removal from the case. *Id.* ¶ 64. Monaco became a potential witness and/or victim, so office policy required recusal. *Id.*[7]

## IV. May 14, 2021 Arrest and Trial

On May 14, 2021, while the misdemeanor charges against Plaintiff were still pending, Plaintiff was arrested on charges of criminal contempt in the first degree in violation of Penal Law § 215.51(b)(ii), stalking in the fourth degree in violation of Penal Law § 120.45(1), and harassment in the first degree in violation of Penal Law § 240.25. Dkt. No. 126-2 at 22; Dkt. No. 141 ¶ 3; Dkt. No. 141-2. The charges were again based, in part, on Judge Espinal's Order of Protection. The arrest was supported by an arrest warrant dated April 28, 2021, obtained by

[7] Plaintiff challenges this testimony. He alleges that despite Arnow's testimony, Monaco did not apprise superiors of the posts or conflict until 2021 and that Arnow only viewed one post from Plaintiff—the one from March or April of 2021 that concerned Monaco and Rosemarie. *Id.* ¶¶ 62–63.

Wynne, in her capacity as Assistant District Attorney, and sworn to by Mullins in his capacity as investigator. Dkt. No. 126-2 at 22–26. Mullins reported that, following the conclusion of Plaintiff's misdemeanor case in January 2020, Plaintiff had created Instagram and TikTok accounts featuring images and videos of Putnam in violation of the Order of Protection. *Id.* at 23. In one of the TikTok posts, Plaintiff had posted Putnam's name and likeness along with language such as "Carole Baskin in the making." Dkt. No. 126-2 at 23.[8] In one of the videos, Putnam can be seen having a verbal dispute with Plaintiff and is wearing a T-shirt and thong, thereby exposing her buttocks. *Id.* at 23. In a comment on this video, posted on April 14, 2021, Plaintiff posted the name of Putnam's employer in response to a user's comment. *Id.* at 24. Mullins also reported that Plaintiff had posted messages on Instagram and TikTok about Monaco and Monaco's mother. *Id.* at 24–25; RSAC ¶ 58. He additionally reported that one of the account's descriptions linked to a website that listed Rosemarie's home address, Dkt. No. 126-2 at 25, and that on April 18, 2021, while out of the country, Monaco received a text to his work cell phone from Plaintiff that stated: "Heard you got dismissed for misconduct. Just wanted to extend and [sic] open line of communication. Give Rose[9] my best," *id.* Mullins reported: "I am informed by Rosemarie Monaco, Mark Monaco, and Hannah Putnam that they fear for their safety and the safety of their families as a result of the defendant's actions." *Id.* at 26.[10]

[8] Baskin is an animal rights activist who was suspected of having been involved in the disappearance of her husband. *See* Audra D.S. Burch, *'Tiger King:' What Happened to Carole Baskin's Husband, Don Lewis?*, N.Y. Times (Apr. 1, 2020), https://www.nytimes.com/article/tiger-king-carole-baskin-don-lewis.html.

[9] Monaco's mother's first name is Rosemarie.

[10] Plaintiff asserts that the addition of Monaco and Rosemarie as complainants was driven by public attention during the 2020 DA race, because Plaintiff's Instagram account made comments about Tahanie Aboushi, a candidate for District Attorney, and tagged her, and the DA's office was aware of those posts. RSAC ¶ 65.

Plaintiff challenges the decision to prosecute him for his public-facing posts on social media, which he regards as protected speech. *See* RSAC ¶ 32. He alleges that in an April 8, 2021 internal email chain, ADA Wynne and colleagues analogized Plaintiff's posts to online "bullying" or calling someone "racist," not to unlawful harassment. *Id.* ¶ 78. They discussed that, rather than pursue legal remedies, they could report the content to Instagram and Facebook so the platforms might remove it. *Id.*; Dkt. No. 126-2 at 18 (email to Wynne discussing that if Monaco reports the posts as harassment, Facebook will shut down the account). Plaintiff also points to a call on April 30, 2021, during which Wynne and Seifullah discussed Putnam's concern with the reputational risk of being portrayed as a "Karen" and described a mitigation plan to protect Putnam's career. RSAC ¶ 79. The notes from the call also indicate that Putnam expressed that she "felt unsafe" because Plaintiff "doesn't care about / doesn't follow" the Order of Protection and that she believed Plaintiff had messaged her on new Instagram accounts in June 2019 and that she learned of new Instagram accounts in April 2020 and "was afraid." Dkt. No. 126-2 at 20.

As the case against Plaintiff proceeded, on July 30, 2021, on petition of ADA Wynne, Judge Farber issued a protective seal which limited Plaintiff's review of discovery to sessions in counsel's presence and control ("Protective Seal"). RSAC ¶ 85. The Protective Seal applies only to materials containing witness contact information, personal identifiers, or images/videos of witnesses. *Id.* ¶ 85. Plaintiff alleges that the seal prevented independent analysis or cross-referencing alleged forgeries with public sources and delayed disclosures.[11] *Id.* ¶ 87.

[11] The discovery provided to Plaintiff included an email exchange between Putnam and Wynne regarding a spam message that Putnam received that she believed "must be" from Plaintiff. RSAC ¶ 69. The message shortly followed the New York City marathon, where Putnam saw Plaintiff among the spectators. *Id.* The message proved to be unrelated to Plaintiff, and Wynne refused to disclose the actual account holder to Plaintiff. *Id.*; *see* Dkt. No. 126-2 at 2–3 (letter to

The case proceeded to trial on September 8, 2022, at which Monaco, Rosemarie, Mullins, Bardliving, and Putnam testified. Assistant District Attorneys Perlman and Nguyen tried the case. *Id.* ¶ 88. On September 22, 2022, Plaintiff was convicted, after a jury trial, on two counts of criminal contempt in the second degree in violation of Penal Law § 215.50, three counts of stalking in the fourth degree in violation of Penal Law § 120.45(1), and one count of harassment in the first degree in violation of Penal Law § 240.25. RSAC ¶ 104; Dkt. No. 141 ¶ 3; Dkt. No. 141-2. He was sentenced to three years' probation on April 24, 2023. RSAC ¶ 104.

Plaintiff complains of alleged misconduct by the prosecutors and investigators during the prosecution of the cases against him. In essence, he complains that the prosecutors ignored evidence that Putnam was the real wrongdoer, prosecuted him on baseless and contrived charges, and suppressed evidence and suborned perjury. Plaintiff's primary allegations of misconduct as to the 2022 trial fall into two categories: (1) reliance on a legally deficient and constitutionally suspect theory of criminal liability, and (2) use of inconsistent testimony.

First, as to the DA's Office's theory of the case, Plaintiff alleges that the ADAs used his initial wrongful arrest to "backfill probable cause" and improperly framed Plaintiff's public posts, which he argues are protected by the First Amendment, as direct communication that constituted harassment and violation of the Order of Protection. *Id.* ¶¶ 92–94. In particular, he challenges as improper Perlman's argument that since Plaintiff was advised through the October 7, 2020 complaint that his posts impacted Plaintiff and through the May 14, 2021 arrest warrant that there was a death threat directed at Putnam, there was a nexus between Plaintiff's conduct

---

Plaintiff's attorney and email exchange between Wynne and Putnam). Plaintiff asserts that Defendants knew that some of the accounts contacting Putnam were, in fact, Putnam contacting herself while posing as a stranger. RSAC ¶ 69; *see also id.* ¶ 100. Plaintiff does not provide any factual allegations to support this contention.

and the impact on Putnam. *Id.* ¶¶ 92–93. He additionally challenges Perlman's characterization of his posts as direct communication for which he could be criminally liable. *See id.* ¶ 94 (alleging that Perlman's argument "conflates forwarded, third-party chatter with first-person 'contact,' letting the state pretend public commentary about public actors equals prohibited communication to them"); *see id.* ¶¶ 95–99 (noting that Perlman argued to jurors in summation that the case was "about third-party contact" and the impact of the followers on Plaintiff's accounts on the complainants). Plaintiff also protests Perlman's argument to the jury that they should infer that by tagging Putnam's acquaintance in a post, Plaintiff intended the post to reach Putnam. *Id.* ¶ 98; *see also id.* ¶¶ 100–01 (alleging that prosecutors told the jury that the Order of Protection prohibited public posts about the protected person and that Plaintiff could not have been unaware of the impact of his actions).

Second, Plaintiff alleges that prosecutors relied on inconsistent testimony from Putnam, Monaco, Rosemarie, and other ADAs prosecuting the case which he alleges demonstrates that the allegations of fear were falsified. *See, e.g.*, *id.* ¶¶ 81–83. As to Putnam, Plaintiff alleges that she committed perjury before multiple courts, with the blessing of the district attorney. *Id.* ¶ 71. Plaintiff contrasts her testimony in family court with her testimony at trial, highlighting that at trial she testified to matters that she testified she could not recall in family court. For instance, in family court, she testified that she did not recall sending a message to Plaintiff in which she stated that she indicated to Monaco that she wanted to drop the charges, stated that Monaco believed she was lying to the police, *id.* ¶ 74, and criticized Monaco, *id.* ¶¶ 75–76, whereas, at trial, she testified that she remembered texting Plaintiff that Monaco told her, "you know it's a crime to make a false statement to the police," *id.* ¶ 74, and that she believed in that conversation she called Monaco a "dick" or said that she thought she was smarter than him and that he was

threatening her, *id.* ¶¶ 75–76. In regard to Plaintiff's posts, Putnam testified in family court that she did not recall whether there were comments with respect to her "utilizing the legal system in an unfair manner against the person of color" but testified during trial that she believed there were comments on TikTok which were assertions of white privilege and that one of her concerns was being labeled a Karen. *Id.* ¶ 77; *see also id.* ¶¶ 71–72 (alleging that in family court, Plaintiff testified that she recalled asserting that Plaintiff pushed her down on the floor of the bathroom, whereas at trial she testified that she walked into the bathroom and sat down on the bathroom floor).

As to Monaco, Plaintiff alleges that Monaco's testimony contradicted the affirmations signed by Bardliving and Mullins. Monaco testified at trial that his initial arrest of Plaintiff was premised on threats to Putnam's career and that his concern for himself and his mother, which was included in the 2021 arrest warrant signed by Mullins, focused on public statements about racism. *Id.* ¶ 89. Plaintiff asserts that this testimony is inconsistent with the affirmations that Plaintiff's conduct caused reasonable fear. As to Rosemarie, Plaintiff alleges that her testimony centered on shaming and public embarrassment, not safety. *Id.* ¶ 57. She testified based on what others said—people from church or people calling—but did not identify a direct, credible threat. *Id.* He alleges that Monaco testified that neither he nor his mother received any social media communications in connection with Plaintiff, but on the arrest warrant, Mullins stated that Monaco had observed social media posts made by Plaintiff that featured images of himself and his mother, captioned with harassing words. *Id.* ¶ 58. Plaintiff also points to testimony regarding a Facebook message that Rosemarie received. Monaco testified that he told Mullins or Wynne that he believed the message was unrelated to Plaintiff, *id.* ¶ 60, and that he told his mother, "I did not believe . . . it was an account connected to Mr. Perry" and that he "tried to

reassure her that it was very likely to be unrelated," *id.* ¶ 59. Prosecutors were aware the message was related to an elder scam. *Id.* Prosecutors relied on testimony regarding the Facebook message at trial, including Monaco's testimony that following his mother's receipt of the message "she was scared" and that he instructed his mother "[t]o report it to the investigator on the case." *Id.* ¶ 60.

Plaintiff additionally challenges Bardliving's and Mullins's testimony at trial as contradicting the affidavits supporting his arrest. In particular, Plaintiff alleges that Bardliving swore in the affidavit supporting the October 2020 charges that Putnam and others "feared for their safety." *Id.* ¶ 82. At trial, Bardliving testified that when she received a text message from Plaintiff with a link to the posts, she was not afraid, and testified "Why would I be scared? No." *Id.* Plaintiff asserts that "Bardliving's own disbelief in any threat confirms she knew the complainants' fear was feigned, yet adopted their scripted language to justify unconstitutional warrants." *Id.* With respect to the 2021 felony warrant, Plaintiff alleges that, while Mullins had sworn in that warrant that Plaintiff "placed persons in reasonable fear or injury or death," at trial Mullins testified that he could identify "no specific [threats]" of harm or death. *Id.* ¶ 83.

Plaintiff does not contest that he published the posts at issue in Bardliving's or Mullins's affirmations or those referenced at trial. *See id.* ¶ 66 (characterizing his posts as having "political character" that constituted "political and social commentary—not threats—criticizing racial bias and privilege"); *id.* ¶ 80 (characterizing prosecution as "a coordinated effort . . . to convert embarrassment into state-backed enforcement against protected speech"); *id.* ¶ 84 (Mullins's warrant "targets words—mere information existing in the public sphere—as though their very existence could constitute harassment"). His allegation of "manufactured 'evidence'" instead relates to the alleged "invent[ion of] a concept of fear untethered to fact or law." *Id.*

## V. Post-Conviction Allegations

### A. Reposted Social Media Content

Plaintiff alleges that in the months leading up to filing the present lawsuit, Plaintiff increased his public commentary on social media. *Id.* ¶ 119. He also republished all prior social media content that was the subject of the investigation and conviction. *Id.* ¶ 124. He emailed Bragg, Perlman, Nguyen, and Del Pizzo to inform them of his posts and the pending lawsuit. *Id.* ¶¶ 119, 124.[12] During a hearing on July 7, 2025, on his motion to modify the Protective Seal, Plaintiff additionally disclosed to the court that he had reposted the disputed content and that Putnam had viewed the content and then challenged the DA's Office to pursue new charges if they believed the content was criminal. *Id.* ¶ 125. The DA did not respond to Plaintiff's statement. *Id.*

### B. Freedom of Information Law Request

Following his conviction, Plaintiff sought access to information blocked by the Protective Seal issued by Judge Farber. In August 2023, Plaintiff moved to modify the Protective Seal issued by Judge Farber to permit Plaintiff's access to discovery outside of his counsel's presence. *Id.* ¶ 121. Under C.P.L. § 245.70(5), *pro se* defendants may request modification of a protective seal upon showing good cause. *Id.* Plaintiff accordingly made this request *pro se*, but Judge Pickholz refused to relieve prior counsel and denied the motion for modification. *Id.* ¶ 122. Plaintiff then filed a follow-up motion on September 20, 2023, and the court again denied modification of the Protective Seal on October 17, 2023. *Id.*

[12] Plaintiff alleges that following these emails, his probation classification was subsequently increased, and, on October 17, 2024, he was detained for five hours. *Id.* ¶ 119. Additionally, on October 28, 2024, Plaintiff appeared before Judge Josh Hanshaft on a parole violation, who issued a no-contact order barring public social media comments about prosecutors. *Id.* ¶ 120.

Plaintiff additionally filed requests under New York's Freedom of Information Law ("FOIL") to determine whether the DA's Office had pressured social media platforms to suppress his accounts. *Id.* ¶ 131. He alleges that his social media traffic has been severely throttled following prosecution, falling from millions of views to barely 100 per post. *Id.* ADA McCabe denied Plaintiff's requests under FOIL based on the Protective Seal. *Id.*

### C. Attorney Grievance Committee

Plaintiff was admitted to the Bar of the State of New York on September 16, 2013. *Matter of Perry*, 236 N.Y.S.3d 57 (1st Dep't 2025), *appeal dismissed*, *leave to appeal denied*, 273 N.E.3d 920 (N.Y. 2025).

Beginning in May 2023, Jorge Dopico and Raymond Vallejo, acting through the Attorney Grievance Committee for the First Judicial Department (the "AGC"), initiated disciplinary proceedings based on Plaintiff's criminal conviction and public criticism of the Manhattan District Attorney's Office. *Id.* ¶ 132. Plaintiff alleges that Seifullah and Wynne communicated with the AGC prior to trial, but the AGC did not preserve or disclose any internal record of those communications. *Id.* ¶ 133. In support of that allegation, Plaintiff attaches to the complaint an email from Wynne to others at the DA's Office, stating "in case this comes up . . . [t]he family court firm wrote to the bar about Perry (because of that one post targeting the family court attorney)." Dkt. No. 126-3 at 42. On June 5, 2025, the Appellate Division, First Department issued an order suspending Plaintiff's license for one year, relying on the findings from Plaintiff's conviction. RSAC ¶ 135.

## PROCEDURAL HISTORY

Plaintiff initiated this case by complaint filed on November 12, 2024. Dkt. No. 1. He was granted leave to proceed *in forma pauperis* on December 20, 2024. Dkt. No. 5.

Plaintiff filed a second amended complaint on August 25, 2025. Dkt. No. 96. Plaintiff filed a revised second amended complaint on November 24, 2025. Dkt. No. 126. He filed a corrected revised second amended complaint on December 29, 2025. Dkt. No. 131.

On January 16, 2026, the Moving Defendants filed this motion to dismiss. Dkt. No. 140. They also filed the declaration of Jonathan Hutchinson, a memorandum of law in support of the motion, and a Local Civil Rule 12.1 Notice. Dkt. Nos. 141–43. Plaintiff filed a memorandum of law in opposition to the motion on March 20, 2026. Dkt. No. 156. On April 17, 2026, the Moving Defendants filed a reply memorandum in further support of the motion to dismiss. Dkt. No. 160.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Put another way, the plausibility requirement "calls for enough

fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556.

As a general matter, the Court construes *pro se* pleadings broadly and liberally, interpreting them so as to raise the strongest arguments they suggest. *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000). This obligation "is especially true when dealing with *pro se* complaints alleging civil rights violations." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 146 (2d Cir. 2002). However, where, as here, the self-represented plaintiff is also an attorney, he is not entitled to have his pleadings construed liberally. *Tracy v. Freshwater*, 623 F.3d 90, 102–03 (2d Cir. 2010). Moreover, the liberal pleading standard, even if it was applicable, does not relieve self-represented plaintiffs of the requirement that they plead enough facts to "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (per curiam) (plaintiff must state a plausible claim for relief). Nor does it relieve them of the obligation to otherwise comply with the pleading standards set forth by the Federal Rules of Civil Procedure. *See Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 687 (S.D.N.Y. 2007).

## DISCUSSION

As relevant here, Plaintiff brings claims for (i) violation of the First Amendment against Bragg and Monaco (and others), RSAC ¶¶ 150–63; (ii) violation of the Fourth Amendment against Bragg, Monaco, Mullins, and Bardliving, *id.* ¶¶ 164–72;[13] (iii) violation of the Sixth

[13] Plaintiff also brings claims on behalf of Beulah Perry in his capacity as executor, RSAC ¶¶ 173–83. A self-represented plaintiff may not bring a claim on behalf of another person. *See Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) (a litigant proceeding *pro se* "may not appear on another person's behalf in the other's cause"). Accordingly, Count III is dismissed without prejudice. *See Rodriguez v. ACS*, 2023 WL 8891413, at *1 (E.D.N.Y. Dec. 26, 2023) (dismissing claims brought by *pro se* plaintiff on behalf of minor child without prejudice).

Amendment against Bragg, Wynne, Perlman, and Nguyen, *id.* ¶¶ 184–99; (iv) violation of the Fourteenth Amendment against Bragg and Monaco for the fabrication of evidence, the knowing use of perjured testimony, and the suppression of exculpatory evidence, *id.* ¶¶ 200–22; (v) violation of the Fourteenth Amendment against Bragg and Monaco for the selective prosecution of him on grounds of race and his speech, *id.* ¶¶ 223–32; (vi) violation of the First and Fourteenth Amendments against Bragg and Monaco for denial of the right of access to the courts, *id.* ¶¶ 233–43; and (vii) civil conspiracy in violation of 42 U.S.C. §§ 1985(2) and (3) against Bragg and Monaco, *id.* ¶¶ 251–61. Plaintiff also brings a claim against the City for municipal liability under 42 U.S.C. § 1983, *id.* ¶¶ 262–68.[14]

Plaintiff's complaint is difficult to decipher. He frames his counts narrowly, but the body of his complaint contains a lengthy and somewhat disjointed discussion of all of his grievances. The counts alleging First, Fourth, and Fourteenth Amendment violations by Monaco thus do not include allegations regarding the 2021 arrest warrant for which Plaintiff elsewhere alleges

---

[14] Plaintiff also brings claims for violation of his rights under the New York Constitution, including his right to freedom of speech, RSAC ¶¶ 269–71, his right to due process and equal protection, *id.* ¶¶ 272–82, and his right against unreasonable searches and seizures, *id.* ¶¶ 283–86, as well as common law claims for abuse of process, *id.* ¶¶ 287–303, intentional infliction of emotional distress, *id.* ¶¶ 315–24, defamation/false light, *id.* ¶¶ 325–37, and tortious interference with contract or business relations, *id.* ¶¶ 338–46; and a claim for violation of New York Judiciary Law § 487 for attorney deceit, *id.* ¶¶ 304–14. As a preliminary matter, the Moving Defendants argue that Plaintiff's claims under New York state constitutional and common law should be dismissed because Plaintiff did not serve a Notice of Claim within the requisite time following the acts alleged in the RSAC. Dkt. No. 142 at 21. "[A] notice of claim, pursuant to § 50–e is a mandatory condition precedent to the bringing of a tort claim against a public corporation, or any of its officers, appointees, or employees. Absent a showing of such a notice of claim, the complaint may be dismissed for failure to state a cause of action." *Brown v. Metro. Transp. Auth.*, 717 F. Supp. 257, 259 (S.D.N.Y. 1989); *see also Eugene v. City of New York*, 2026 WL 1831351, at *16 (S.D.N.Y. June 25, 2026). Plaintiff does not dispute that he failed to timely file a Notice of Claim and argues that the Court should stay his state-law claims or, at a minimum, dismiss them without prejudice. Dkt. No. 156 at 10. Accordingly, Counts XI to XVIII are dismissed without prejudice for failure to file a Notice of Claim as against the Moving Defendants, all of whom are public actors.

Monaco supplied false information for. *Compare* RSAC ¶¶ 56–60, *with id.* ¶¶ 150–72, 200–22. He complains about Wynne's relationship with the AGC, *see id.* ¶ 133, but he does not link those allegations with any count alleging wrongdoing on her part. Although Plaintiff is a self-represented attorney and therefore not entitled to any special solicitude, in construing the RSAC, the Court has extended such solicitude. It construes each of Plaintiff's claims in light of the allegations across his complaint. "[A] complaint need not pin plaintiff's claim for relief to a precise legal theory" nor provide "an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011); *accord Arrocha v. City Univ. of N.Y.*, 878 F. Supp. 2d 364, 368 (E.D.N.Y. 2012), *aff'd*, 523 F. App'x 66 (2d Cir. 2013) (summary order). In analyzing well-pled facts, a court will draw all reasonable inferences in favor of the plaintiff, *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591–92 (2d Cir. 2007), and will "determine whether a complaint states a claim based on '*all* of the facts alleged, taken collectively,' not whether an inference [of liability] is permissible based on 'any individual allegation, scrutinized in isolation,'" *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 81 (2d Cir. 2022) (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021)).

Defendants argue that the claims against the Individual Defendants should be dismissed on grounds of absolute prosecutorial immunity or qualified immunity, for failure to state a claim for relief, or because Plaintiff does not allege personal involvement in any of the underlying conduct. Dkt. No. 142 at 4–14, 16–18. Defendants further argue that Plaintiff's First, Sixth, and Fourteenth Amendment claims against them are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). *Id.* at 14–15. Finally, Defendants argue that Plaintiff has not alleged a conspiracy claim under Section 1985. *Id.* at 18–20.

## I. The Majority of Claims Against the ADA Defendants Are Barred by Absolute Immunity

Defendants argue initially that Plaintiff's claims against the ADA Defendants are barred by the doctrine of absolute immunity.

Prosecutors receive absolute immunity from suit under Section 1983 when they engage in "advocatory conduct that is 'intimately associated with the judicial phase of the criminal process.'" *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "This immunity attaches to conduct in court, as well as conduct 'preliminary to the initiation of a prosecution and actions apart from the courtroom.'" *Id.* (quoting *Imbler*, 424 U.S. at 431 n.33). "The immunity covers 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022) (quoting *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995)). "The rationale for conferring absolute immunity in such circumstances is that '[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.'" *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (quoting *Imbler*, 424 U.S. at 424–25)). Thus, "the immunity attaches to his function, not to the manner in which he performed it." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (citation omitted). "Because the immunity attaches to the official prosecutorial function, and because the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions, the prosecutor has absolute immunity for the initiation and conduct of a prosecution 'unless [he] proceeds in the clear absence of all jurisdiction,'" *Shmueli*, 424 F.3d at 237 (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)). While "investigative acts . . . undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and

determination of the perpetrators" are not entitled to absolute immunity, "investigative acts reasonably related to decisions whether or not to begin or to carry on a particular criminal prosecution, or to defend a conviction" are. *Giraldo*, 694 F.3d at 166.

The immunity turns on the function and not on the person. *Burns v. Reed,* 500 U.S. 478, 486 (1991). "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Id.* (internal quotation marks omitted). "A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.*; *accord Hill*, 45 F.3d at 661. Actions taken as an investigator and not in preparation for the initiation of a prosecution enjoy only qualified immunity. *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000). "The relevant question . . . is whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor. If the generic acts are within those functions, absolute immunity applies[.]" *Giraldo*, 694 F.3d at 166.

The absolute immunity accorded to a prosecutor thus extends to "individual employees who assist such an official and who act under that official's direction in performing functions closely tied to the judicial process," including to non-lawyer employees of the district attorney's office. *Hill*, 45 F.3d at 660; *accord Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) (summary order); *O'Neal v. City of New York*, 196 F. Supp. 3d 421, 432 (S.D.N.Y. 2016), *aff'd sub nom. O'Neal v. Morales*, 679 F. App'x 16 (2d Cir. 2017) (summary order); *Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 281 (W.D.N.Y. 2001).

The vast majority of Plaintiff's allegations charge the ADA Defendants for conduct as to which they enjoy absolute immunity. Plaintiff claims that Monaco ignored evidence inculpating Putnam or exculpating him and used snippets of evidence to compel a disorderly conduct plea by him in pursuit of the 2019 charges. RSAC ¶¶ 31–32, 37–40. Leaving aside the pejorative characterizations and implications of improper motive, all of that involves the ordinary activities of a prosecutor—the evaluation of evidence, the engagement in plea discussions, and the crafting of charges. "A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Imbler*, 424 U.S. at 431 n.33. The acts Plaintiff alleges Monaco committed in connection with the 2019 charges are those inherent to the job of a prosecutor.

As to the 2020 charges, even accepting Plaintiff's allegations of false information and improper motive, Plaintiff has not alleged any conduct by Monaco that would not be protected by absolute immunity. Plaintiff alleges that Monaco orchestrated his arrest and the seizure of his devices on September 24, 2020, in retaliation for public posts criticizing Monaco, on the basis of facts that Defendants knew were false, without reference to exculpatory context, and in pursuit of a novel and aggressive theory of prosecution "to convert protected speech into 'threats' and 'fear.'" RSAC ¶¶ 52–53, 151, 165. A prosecutor is protected by absolute immunity for the performance of his functions both in "initiating" and in "pursuing a criminal prosecution," *Imbler*, 424 U.S. at 410, so long as "the pertinent statutes may have authorized prosecution for

the charged conduct." *Shmueli*, 424 F.3d at 237. Here, the pertinent statutes prohibit criminal contempt in the second degree, P.L. 215.50(3), and aggravated harassment in the second degree, P.L. 240.30(1)(b). The New York County Criminal Court has jurisdiction over an offense if any element was committed in the county, N.Y. Crim. P. Law § 20.40, and the DA's Office has the duty to prosecute offenses within the county, N.Y. Cnty. § 700(1). Prosecution on the basis of those charges was therefore within Monaco's jurisdiction. *See Shmueli*, 424 F.3d at 238. The misdemeanor complaint sworn by Bardliving on October 7, 2020 was based on Plaintiff's communication with Putnam in violation of the January 2020 Order of Protection, *see* Dkt. No. 126-2 at 28 (alleging that Plaintiff, through a public Instagram story, responded to Putnam's message), and the theory that his TikTok and Instagram accounts communicated threats that caused Putnam to fear for her physical safety and employment, *id.* at 28–31. Whether the misdemeanor complaint was based on false or incomplete information, or the ADAs in fact had probable cause to pursue the charges, is irrelevant to whether the prosecution was authorized by statute and whether the conduct is covered by absolute immunity. *See Buckley*, 509 U.S. at 274 n.5 (absolute immunity applies to "a prosecutor's decision to bring an indictment, whether he has probable cause or not"); *Shmueli*, 424 F.3d at 237 (absolute immunity applies "despite allegations of [the prosecutor's] 'knowing use of perjured testimony' and the 'deliberate withholding of exculpatory information.'" (quoting *Imbler*, 424 U.S. at 431 n.34)).

Plaintiff's allegation that Monaco was motivated by an interest in retaliation does not change the analysis. "Once the court determines that the challenged prosecution was not clearly beyond the prosecutor's jurisdiction, the prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive." *Shmueli*, 424 F.3d at 237. That

protection applies even if the prosecutor commenced a prosecution "for purposes of retaliation or for purely political reasons." *Id.* (internal citations omitted); *see id.* ("[In] the realm of absolute immunity, . . . evaluation of motive and reasonableness is forbidden." (quoting *Robison v. Via*, 821 F.2d 913, 920 (2d Cir. 1987))). Such conduct, if it occurred, "would be 'reprehensible,'" *id.* (quoting *Imbler*, 424 U.S. at 431 n.34), but that does not mean that it can open the prosecutor to a suit for damages. "[T]he nature of absolute immunity is such that it 'accords protection from . . . any judicial scrutiny of the motive for and reasonableness of official action.'" *Id.* (quoting *Robison*, 821 F.2d at 918). It also prevents a defendant from immunizing himself from prosecution by posting derogatory messages about the prosecutor. If, during the prosecution of the charges against him, the ADAs engaged in misconduct, Plaintiff's remedy lies elsewhere than in a Section 1983 lawsuit for damages.

The same can be said and more with respect to the claims against Perlman. Plaintiff alleges that Perlman (and her trial partner Nguyen) relied on the temporary order of protection from family court to secure a conviction, presented falsehoods to the jury, and collapsed protected public commentary into prohibited "communication." RSAC ¶ 98. But Perlman engaged in all of that conduct wearing her hat as prosecutor. The time and place for Plaintiff to have complained about the presentation of the evidence to the jury and the novelty of the District Attorney's theory was at the criminal trial and on appeal. It is not through a damages claim against the prosecutor who secured Plaintiff's conviction.

As to the remaining ADA Defendants, Plaintiff complains that Wynne petitioned Judge Farber to issue a protective seal limiting his review of discovery and declined to provide the name of the account holder who sent spam to Putnam. But the obtaining of judicial orders, including protective seals or orders, is the ordinary activity of a prosecutor involved in the

judicial function. Plaintiff does not allege facts to support that the identity of the person who sent spam to Putnam was exculpatory but, even if it was, a prosecutor is entitled to absolute immunity despite allegations of the "deliberate withholding of exculpatory information." *Imbler*, 424 U.S. at 431 n.34.[15] Wynne cannot be held liable for conduct she engaged in in her capacity as a prosecutor. *See Shmueli*, 424 F.3d at 238 ("The allegations that the ADAs prosecuted [plaintiff] and continued with the prosecution describe only functions for which a prosecutor is normally accorded absolute immunity."). Nor can she be held liable for considering alternatives to prosecution. RSAC ¶¶ 78–79. After all, it is the job of the prosecutor to decide when to charge and when not to charge. *See Swinton v. City of New York*, 785 F. Supp. 2d 3, 8 (E.D.N.Y. 2011) ("'A prosecutor thus has absolute immunity in connection with the decision whether or not to commence a prosecution,' and for the 'decision as to what offenses are and are not to be charged.'" (quoting *Ying Jing Gan v. City of New York*, 996 F.2d 522, 530 (2d Cir. 1993))). Relatedly, Plaintiff alleges that Del Pizzo, upon viewing the social media content, asked whether there was anything with which he could be charged, RSAC ¶ 80, and that Tierney, Silberg, and Arnow were involved in the decisions regarding the charges to be made against Plaintiff and the evidence to be presented against him, *id.* ¶¶ 80, 106, 309. It is the job of the prosecutor, and one for which she enjoys absolute immunity, to determine whether an individual who is believed to have engaged in antisocial conduct can be charged with a crime. *See Ying Jing Gan*, 996 F.2d at

---

[15] As to the Protective Seal regarding discovery, Plaintiff broadly alleges that "Prosecutors then blocked Plaintiff's access to discovery to prevent a defense." RSAC ¶ 32. Plaintiff provides no allegations in support of this allegation apart from the issuance of the Protective Seal. Moreover, that seal did not bar his access to discovery. Instead, it required that for certain materials—those containing witness contact information, personal identifiers, or images/videos of witnesses—review is limited to sessions in counsel's presence and control. *Id.* ¶ 85. For the reasons stated, absolute immunity bars any claim based on the request for the Protective Seal.

531 (the decision to bring charges are "plainly decisions as to which [the ADAs are] entitled to absolute immunity"). They are each entitled to absolute immunity.[16]

Plaintiff is clearly aggrieved by the fact that he was prosecuted on an apparently novel theory that his communications to the public about Putnam could be considered to be violative of the Order of Protection prohibiting him from having contact with Putnam. It is precisely the function of absolute immunity to permit prosecutors to "go forward with a close case" where there is a risk of acquittal. *Buckley*, 509 U.S. at 270 n.4 (quoting *Imbler*, 424 U.S. at 426 n.24). A powerful amicus brief was submitted to the state court arguing that Plaintiff's prosecution impinged on First Amendment values. Dkt. No. 126-3 at 50–80. The court held, however, that counsel failed to preserve Plaintiff's First Amendment claims, which were raised for the first time on appeal. *People v. Perry*, 218 N.Y.S.3d 58 (1st Dep't 2024), *leave to appeal denied*, 265 N.E.3d 1114 (N.Y. 2025). As the Supreme Court expressed in *Buckley*, it would undermine the "vigorous enforcement of the law" to give Plaintiff another bite at the apple through a damages action in federal court. *Buckley*, 509 U.S. at 270 n.4.

Plaintiff's claims against Bragg, Del Pizzo, Silberg, Tierney, Arnow, Perlman, and Nguyen are therefore dismissed as barred by absolute immunity. Plaintiff's claims against

---

[16] Plaintiff names Bragg only in his capacity as a final policymaker. RSAC ¶¶ 12, 150, 164, 169, 173, 180, 184, 190, 200, 208, 223, 233, 251, 262, 263, 297. Plaintiff does not allege anything that Bragg actually did in connection with the investigation or prosecution of the cases against him. To state a claim against a defendant under Section 1983, however, the plaintiff must establish the defendant's "personal involvement in the alleged constitutional deprivation." *Batista-Reyes v. Paul*, 2026 WL 2386336, at *13 (2d Cir. Aug. 17, 2026) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). "[A] plaintiff may not rely on a special test for supervisory liability. Rather, 'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Accordingly, Plaintiff's allegations against Bragg fail to state a claim for relief and the complaint thus must be dismissed as against him.

Monaco and Wynne, except as to the allegations discussed below, are also barred by absolute immunity.

## II. Plaintiff Has Not Stated a Claim for Relief as to Those Allegations Against the ADA Defendants That Are Not Covered by Absolute Immunity

Plaintiff does allege certain conduct for which the prosecutors are not entitled to absolute immunity. Plaintiff charges, for example, that Monaco directed the preparation of Mullins's sworn affidavit for Plaintiff's 2021 arrest warrant, which criminalized protected speech regarding racism and contrived "to convert embarrassment into state-backed enforcement against protected speech." RSAC ¶¶ 80, 84. Plaintiff alleges that in connection with the 2021 charges, Monaco instructed his mother to "knowingly make[] false statements to law enforcement," including about an unrelated Facebook message. *Id.* ¶¶ 57, 59. Plaintiff further claims that Monaco's statement to Mullins (reported in the warrant for Plaintiff's 2021 arrest) that he "observed a series of social media posts made by the Plaintiff 'featuring images of [ADA Monaco] and/or images of his mother, Rosemarie Monaco, most captioned with harassing words against him and his mother'" was false because he later testified at trial that "neither he, nor his mother, received any social media communications in connection with Plaintiff." *Id.* ¶ 58. Wynne allegedly had contact with the Attorney Grievance Committee deciding whether to take action against Plaintiff. *Id.* ¶¶ 133–34 (alleging that Seifullah, in coordination with Wynne, "communicated with the AGC before trial, prejudicing the disciplinary process and tainting it with the same false narrative underlying the criminal case").

Defendants have not established that Monaco and Wynne are entitled to absolute immunity for that alleged conduct. As of April 2021, when Mullins signed the arrest warrant, Monaco was no longer a prosecuting attorney. He was a complaining witness. *See Washington v. Napolitano*, 29 F.4th 93, 104 (2d Cir. 2022) ("[I]f a prosecutor acts as a complaining witness by testifying to the evidentiary basis for an arrest warrant application, 'the only function that she

performs in giving sworn testimony is that of a witness,' and absolute immunity cannot extend even to a prosecutor in such a situation." (quoting *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997))). Nor have Defendants shown that Wynne's conduct was "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley*, 509 U.S. at 273; *see id.* at 277–78 (holding that prosecutor's statements to the press about indictment had "no functional tie to the judicial process just because they are made by a prosecutor," and were therefore not protected by absolute immunity). Wynne's alleged communications to the Attorney Grievance Committee—a disciplinary body separate from the criminal court—did not become advocacy merely because they touched on facts related to a pending case. *Id.* at 277. It follows that they are therefore not shielded by absolute immunity.

Plaintiff's claims fail instead because even if the allegations are taken as true, as they must be for this motion, they fail to state a claim for relief.

**A. Allegations Against Monaco**

Plaintiff alleges that Monaco violated the First, Fourth, and Fourteenth Amendments to the United States Constitution. Construing Plaintiff's allegations liberally, they could be read to argue that Monaco's action in helping to obtain the 2021 arrest warrant through deliberate or reckless falsehoods and omissions, and in retaliating for Plaintiff's speech accusing Monaco of racial bias, violated Section 1983. RSAC ¶¶ 57–60, 81–84, 164, 168, 206.

"In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citations omitted). "To act under color of state law or authority for

purposes of section 1983, the defendant must 'have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir. 1997) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). A defendant may act under color of state law for purposes of Section 1983 where his conduct "satisfies the state-action requirement of the Fourteenth Amendment," *i.e.* "the defendant's alleged infringement of the plaintiff's federal rights is 'fairly attributable to the State.'" *West*, 487 U.S. at 49 (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50. However, not every action taken by a person who is employed by a state agency is an action taken under color of state law. *See Gleason v. Scoppetta*, 566 F. App'x 65, 68 (2d Cir. 2014) (summary order). Rather, "[i]t is 'axiomatic that under "color" of law means "pretense" of law and that acts of officers in the ambit of their personal pursuits are plainly excluded.'" *Monsky*, 127 F.3d at 245 (quoting *Pitchell*, 13 F.3d at 547–48). There is "no bright line test for distinguishing 'personal pursuits' from activities taken under color of law," *Pitchell*, 13 F.3d at 548, and a court must "look to the 'nature of the officer's act' to determine whether he acted under color of state law, not just his 'status' of being on or off official duty," *Gleason*, 566 F. App'x at 68 (quoting *Pitchell*, 13 F.3d at 548).

A plaintiff alleging that he was arrested in retaliation for protected speech "must plead and prove the absence of probable cause for the arrest" except in the circumstance when the "plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*,

587 U.S. 391, 402, 407 (2019).[17] "A claim that an arrest was made in retaliation for the exercise of First Amendment rights—like a claim for false arrest or malicious prosecution—may be defeated by the existence of probable cause for the arrest." *Rupp v. Buffalo*, 91 F.4th 623, 638 (2d Cir. 2024). "[T]he statements and motivations of the particular officer are irrelevant." *Savarese v. City of New York*, 547 F. Supp. 3d 305, 346 (S.D.N.Y. 2021) (quoting *Nieves*, 587 U.S. at 407).

A Section 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). To establish a claim for false arrest and imprisonment, a plaintiff must prove: "(1) the defendant intended to confine the plaintiff, (2) plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003). Confinement is privileged, however, and a complete defense exists to a claim for false arrest and imprisonment, when it is supported by probable cause. *Weyant*, 101 F.3d at 852; *see Banyan v. Sikorski*, 2021 WL 1163653, at *5 (S.D.N.Y. Mar. 26, 2021), *reconsideration denied sub nom.*, 2021 WL 2156226 (S.D.N.Y. May 27, 2021) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007))). "Probable cause to arrest exists when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient

[17] The Supreme Court and Second Circuit have emphasized that the exception for when similarly situated individuals were not prosecuted for the same sort of protected speech is "'slim.'" *Alberty v. Hunter*, 144 F.4th 408, 419 n.4 (2d Cir. 2025) (quoting *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024)).

to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant*, 101 F.3d at 852). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

To succeed in challenging probable cause for arrest based upon misstatements and omissions in a warrant application, the plaintiff must demonstrate that the officer submitting the probable cause affidavit "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit" or omitted material information, and that such false or omitted information was "necessary to the finding of probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870–71 (2d Cir. 1991) (citations omitted). Courts in the Second Circuit will "look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." *Escalera*, 361 F.3d at 743–44. In other words, the court "should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993). "If probable cause remains, no constitutional violation of the plaintiff's Fourth Amendment rights has occurred." *Id.* "Only if the corrected affidavit would not 'support a reasonable officer's belief that probable cause existed' would the identified factual disputes be material to resolving the issue." *Escalera*, 361 F.3d at 744 (quoting *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir. 1992)).

The claims against Monaco in connection with the arrest warrant fail for several reasons. As a threshold matter, Plaintiff has not alleged that Monaco was "exercising authority under the color of law and wielding that authority to cause harm to Plaintiff" when he reported to Mullins the social media posts about him and his mother that he had observed. *Savarese*, 547 F. Supp. 3d at 338. "[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West*, 487 U.S. at 50. At the time Monaco made the report to Mullins, he been removed from the case. As a witness, he was not acting in an official capacity or exercising his functions as a prosecutor. Like the traffic agent in *Savarese*, Monaco "was reporting what he perceived to be a crime of which he was the victim. He was not enlisting the officers' help in continuing to carry out his governmental duties." *Savarese*, 547 F. Supp. 3d at 338 ("In placing his call, T.A. Islam . . . was seeking aid of the police in what he perceived to be a dangerous situation, just as every civilian is entitled to do without bringing their actions within the ambit of Section 1983."); *see also Weintraub v. Bd. of Educ. of the City of N.Y.*, 423 F. Supp. 2d 38, 55–58 (E.D.N.Y. 2006). And like the same traffic agent, who was "not himself a peace officer with authority to arrest based upon probable cause," *Savarese*, 547 F. Supp. 3d at 339, Monaco did not himself possess prosecuting authority over Plaintiff at the time, as he had been taken off the case. To hold that he nonetheless continued to be "clothed with the authority of state law" would reduce the inquiry to Monaco's "status" as being on or off official duty, rather than the nature of his acts. *See Gleason*, 566 F. App'x at 68. Rather, Monaco, "in his capacity as a victim," reported to Mullins "a factual account of his version of events, which formed part of the basis on which the police and District Attorney decided to arrest and charge Plaintiff." *Savarese*, 547 F. Supp. 3d at 339.

Even a private citizen can be liable for false arrest under Section 1983 where they "'intentionally provided false information' to instigate an arrest by law-enforcement officials, or had no reasonable basis for the report." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 519 (S.D.N.Y. 2013) (quoting *Brown v. Nassau Cnty.*, 760 N.Y.S.2d 655, 655–56 (2d Dep't 2003)). Courts have held private parties liable for making false reports to law enforcement where the defendant "told the officers that she wanted [plaintiff] arrested." *Weintraub*, 423 F. Supp. 2d at 46. Though Monaco was familiar with Plaintiff before the incidents described in the 2021 arrest warrant on account of his prior involvement in Plaintiff's 2019 prosecution, Plaintiff does not allege facts to support that Monaco induced any officer to act or otherwise procured Plaintiff's 2021 arrest. *See Savarese*, 547 F. Supp. 3d at 341.

Thus, even if the information Monaco provided to Mullins was knowingly false, that alone would not establish a claim for false arrest or a violation of the Fourth Amendment. *Id.*; *see also Bates v. N.Y.C. Transit Auth.*, 721 F. Supp. 1577, 1579–80 (E.D.N.Y. 1989) (transit police officer who allegedly made false statements at an examination before trial of a civil suit "was not cloaked in the garments of his official authority when he testified under oath . . . and therefore was not acting under color of state law"); *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 228 (E.D.N.Y. 2010) (for purposes of false arrest claim, defendant police officer was not acting under color of law when she submitted a criminal complaint to fellow officers accusing her husband of raping her because she was acting merely as a "civilian complainant," and did not exercise her powers as a police officer); *Williams v. New York*, 2022 WL 3647276, at *4 (E.D.N.Y. Aug. 24, 2022) (state senator's district manager did not act under color of state law when he opened a threatening letter, handed it to the police, and informed the police that plaintiff had made a terrorist threat, even if that information was false or mistaken).

Moreover, there is no well-pleaded allegation that Monaco provided false information to Mullins. Plaintiff's false arrest claim is predicated on the warrant. The warrant affidavit reflects that Monaco reported the following information to Mullins: (1) beginning in August 2020, he and his mother were the subject of numerous Instagram and TikTok posts made by Plaintiff, Dkt. No. 126-2 at 24–25; (2) on April 18, 2021, while he was out of the country, Monaco connected his DA cellphone to WiFi and observed a text message sent to that phone from Plaintiff's number reading, "Heard you got dismissed for misconduct. Just wanted to extend and [sic] open line of communication. Give Rose my best," *id.* at 25; and (3) Monaco feared for his safety and the safety of his family as a result of Plaintiff's actions, *id.* at 26. The affidavit also reflects that Rosemarie Monaco informed Mullins that she feared for her safety and that of her family. *Id.* at 26. Plaintiff does not dispute, however, that he authored the social media posts about Monaco and his mother described in the affidavit. To the contrary, he proudly proclaims that he made such posts in the exercise of his First Amendment rights. RSAC ¶¶ 61 ("At the time of ADA Monaco's removal from the case in March of 2021 . . . many of Plaintiff's social media postings alleged ADA Monaco initiated Plaintiff's initial September/October 2020 arrest in furtherance of a 'Cover Up.'"), 66 (alleging that "[p]rosecutors' sealed emails acknowledged Plaintiff's posts were political and social commentary—not threats—criticizing racial bias and privilege"), 84 (alleging that Mullins's sworn warrant was designed "to criminalize protected speech regarding racism"). And Plaintiff does not dispute that he sent the text message to Monaco or allege facts to support that Monaco and his mother did not fear for their safety and that of their families.[18]

[18] Plaintiff's own pleading undercuts his characterization that Monaco "coached his mother to make false statements regarding an unrelated Facebook message." RSAC ¶ 59. Plaintiff asserts that "[p]rosecutors were aware the message was related to an elder scam" and that Monaco told his mother that he did not believe the account was connected to Plaintiff and "tried to reassure her that it was very likely to be unrelated." *Id.*

Plaintiff's allegation that Monaco later testified that neither he nor his mother "received" any social media communications in connection with Plaintiff does not establish falsity; observing a public post and receiving a direct communication are two very different things, and testimony that no one received the latter does not contradict a sworn statement about the former. It thus follows that Plaintiff has not sufficiently pled a Fourth Amendment violation or a due process violation for fabrication of evidence.

Even assuming that some discrete portion of Monaco's account could be characterized as false, the claim independently fails for lack of materiality. *Escalera*, 361 F.3d at 744. Even removing Monaco's characterization that he "observed" Plaintiff's social media posts and that he and his mother "feared for their safety," the affidavit still recites, and Plaintiff does not dispute, an escalating course of conduct by Plaintiff directed at Monaco and his mother by name. *See* Dkt. No. 126-2 at 24–25 (describing numerous Instagram and TikTok posts alleging a "coverup" by Monaco and using public photos of Monaco and his mother); *id.* at 26 (stating that Mullins had determined using AT&T records that the phone number which texted Monaco belonged to Plaintiff and that Facebook records revealed that the social media accounts in question were owned and controlled by Plaintiff). At a minimum, those undisputed facts independently establish probable cause for stalking in the fourth degree as charged in the affidavit. That offense reaches a person who "intentionally, and for no legitimate purpose, engages in a course of conduct directed at a specific person, and knows or reasonably should know that such conduct . . . is likely to cause reasonable fear of material harm to the physical health, safety or property of such person, a member of such person's immediate family or a third party with whom such person is acquainted." N.Y. Penal Law § 120.45(1); Dkt. No. 126-2 at 22. Because the statute

turns on what the conduct is "likely to cause" and what the actor "reasonably should know," the inquiry does not depend on crediting Monaco's own account of his subjective fear.

What is more, the jury that ultimately tried the underlying charges agreed with the issuing court that the social media posts constituted stalking. *See Perry*, 218 N.Y.S.3d at 58 (affirming conviction, after jury trial, on two counts of criminal contempt in the second degree, three counts of stalking in the fourth degree, and harassment in the first degree). A subsequent conviction on the charges upon which a plaintiff was arrested demonstrates probable cause sufficient to defeat a claim for false arrest. *See Cameron v. Fogarty*, 806 F.2d 380, 388–89 (2d Cir. 1986) (incorporating common-law principle that, "where law enforcement officers have made an arrest, the resulting conviction is a defense to a § 1983 action asserting that the arrest was made without probable cause"); *Weyant*, 101 F.3d at 852 (plaintiff's conviction following arrest "would be conclusive evidence of probable cause," provided that the conviction "survives appeal" (quoting *Broughton v. State*, 335 N.E.2d 310, 315 (N.Y. 1975))). The Second Circuit has "further concluded that this principle applies whether the conviction arose 'by jury verdict or guilty plea.'" *Carruthers v. Colton*, 153 F.4th 169, 180 (2d Cir. 2025) (quoting *United States v. Jones*, 43 F.4th 94, 102 n.6 (2d Cir. 2022)). Because a "corrected" affidavit would still support

probable cause,[19] the alleged falsehood was not material to, and therefore did not cause, Plaintiff's arrest.[20]

Plaintiff's allegation that Monaco coordinated with Mullins to prepare warrant applications that were designed to "criminalize protected speech regarding racism" is defeated for the same reasons. Plaintiff has not pled and proven the absence of probable cause for the arrest; indeed, the fact that he was convicted of charges based on the same social media posts serves to defeat his First Amendment claims, as the conviction is conclusive evidence that probable cause existed. *Weyant*, 101 F.3d at 852. Nor has Plaintiff presented "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. That Monaco's true motive for directing the preparation of the 2021 arrest warrant may have been to punish Plaintiff for speech accusing him of racial bias does not alter the outcome. *Savarese*, 547 F. Supp. 3d at

---

[19] The Court need not analyze whether the remaining two charges in the 2021 arrest warrant—criminal contempt in the second degree and harassment in the first degree—were supported by probable cause. "[W]hen faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (emphasis in original). Liability for false arrest under Section 1983 does not attach "if probable cause to arrest the plaintiff existed "for *any* crime—whether or not that particular crime was closely related to the offense the officers said was the reason for the arrest." *Carruthers*, 153 F.4th at 179–80 (quoting *Berg v. Kelly*, 897 F.3d 99, 111 (2d Cir. 2018))); *see id.* at 180–81 (rejecting plaintiff's assertion that he had "a viable false arrest claim because he was arrested not for the traffic infraction but for a DWI offense purportedly without probable cause" because "regardless of the DWI charges, the traffic infraction alone provides the necessary probable cause to defeat Carruthers's false arrest claim"). Because plausible cause existed for Plaintiff's stalking charge, the inquiry ends there.

[20] Even assuming that Monaco was acting under color of state law and Plaintiff had adequately pled a claim for false arrest, Monaco would nonetheless be entitled to qualified immunity for his conduct. Qualified immunity shields government officials from lawsuits when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir. 2015). That the state court affirmed Plaintiff's conviction, after a jury trial, on stalking and harassment counts premised on Plaintiff's social media posts itself suggests that it is not clearly established that Plaintiff's speech is constitutionally protected.

346; *Nieves*, 587 U.S. at 399, 403 (explaining retaliatory motive must be "but for" cause and officer's state of mind is irrelevant and not a basis for invalidating an arrest).

**B. Allegations Against Wynne**

Plaintiff also brings a Fourteenth Amendment "stigma-plus" claim regarding disciplinary action taken by the Attorney Grievance Committee. RSAC ¶¶ 244–50. Wynne is not named in the count itself; Plaintiff's claim rests instead on statements attributed to Seifullah, Putnam, Rosemarie Monaco, and on the AGC order. However, the count does reference conduct by the DA's Office, *see id.* ¶ 245 (alleging that "Seifullah promoted the stigmatizing narrative *in coordination with prosecutors* and . . . communicated with the AGC outside the formal trial record") (emphasis added), and the RSAC's factual allegations reference Wynne specifically, *see id.* ¶ 133 (alleging that "Seifullah, in coordination with ADA Alexandra Wynne, communicated with the AGC before trial, prejudicing the disciplinary process and tainting it with the same false narrative underlying the criminal case"). Even assuming Plaintiff intended to name Wynne and her omission from the count was inadvertent, Plaintiff's allegations do not support a stigma-plus claim against Wynne.

Injury to reputation alone is not a liberty interest protected by the Due Process Clause. *Paul v. Davis*, 424 U.S. 693, 701 (1976). A plaintiff states a stigma-plus claim only by alleging "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false," and "(2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (internal quotation marks omitted). The relevant state-imposed burden must be separate from the stigmatizing statement and may take the form of a "deprivation of a plaintiff's property" or the "termination of a plaintiff's government employment." *Id.* While there is "no rigid requirement . . . that both the 'stigma' and the 'plus'

must issue from the same government actor or at the same time," they must be "sufficiently proximate." *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005). "This requirement will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected—for example, due to their order of occurrence . . . or their origin . . . and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." *Id.* at 89. "The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Id.* at 87. A formal suspension of a professional license is the kind of "termination or alteration of some other legal right or status" that can supply the "plus." *Id.* at 88 (quoting *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989)); *see DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (reversing dismissal of stigma-plus claim by physician whose license was summarily suspended). The Court assumes without deciding that the suspension of a bar license is a sufficient "plus."

Even so read, the RSAC fails on each element. As to the first, Plaintiff does not allege that Wynne initiated the attorney grievance process, that she actually communicated with the investigators from the committee, or that anything she said was false. Plaintiff simply attaches an email from Wynne to two other colleagues at the DA's Office in which Wynne reports that "[t]he family court firm wrote to the bar about Perry (because of that one post targeting the fam court attorney)." Dkt. No. 126-3 at 42. That allegation cannot establish a constitutional violation.

As to the second element, Plaintiff fails to plead a proximate relationship between the alleged stigma and the "plus." The burden Plaintiff identifies is the suspension of his law license, which he attributes to the AGC and its officials and which was ordered by the Appellate Division after disciplinary proceedings. RSAC ¶¶ 135, 249. The "order of occurrence" between

the stigma and plus appears to cut against the proximate requirement. Plaintiff pleads that the AGC initiated disciplinary proceedings in May 2023, and that Wynne communicated with the AGC "before trial." *Id.* ¶¶ 132–33. The suspension came years later in June 2025, after an affirmance of Plaintiff's conviction on appeal, a "serious crime" determination under Judiciary Law § 90(4)(d), a Referee's sanction hearing, and the Appellate Division's own review. *Matter of Perry*, 236 N.Y.S.3d at 58–62. Nothing in that sequence of events would "to a reasonable observer, appear connected" to a pre-trial communication by Wynne. *Velez*, 401 F.3d at 89. Plaintiff's ultimate suspension and Wynne's communication may, however, appear connected by origin, in that they stem from the same underlying investigation into Plaintiff's conduct. But that alone is not enough; "the actor imposing the plus" must "adopt[] (explicitly or implicitly) those statements in doing so." *Id.*

Here, the actor imposing the "plus"—the Attorney Grievance Committee—did not adopt anything Wynne said. The suspension order rests on Plaintiff's convictions and his own conduct, and it does not mention Wynne or any communication with the AGC. Even if Plaintiff had alleged that Wynne herself alerted the AGC to Plaintiff's behavior, that too would not establish the necessary proximate cause, as Plaintiff himself pleads that the proceeding was "predicated on Plaintiff's nonfinal criminal conviction," RSAC ¶ 132, and that the AGC relied on "findings from *People v. Perry*," *id.* ¶ 135. An alleged pre-trial communication by Wynne, followed by a suspension that Plaintiff himself says rested on a criminal conviction, does not connect her to the "plus." Like the defendants who were dismissed from the stigma-plus claim in *Velez*, Wynne had no power to impose the suspension or to provide the process that preceded it. *See Velez*, 401 F.3d at 93 (investigators, who had no legal authority to bring about Plaintiff's removal from office, "could not have imposed the 'plus'").

Plaintiff's claim fails for a third reason. "Because stigma plus is a species within the phylum of procedural due process claims . . . it is not enough that the plaintiff has demonstrated the deprivation of her liberty interest; in order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law. Stated differently, the availability of adequate process defeats a stigma-plus claim." *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006); *see Velez*, 401 F.3d at 87 (claim requires that defendants deprived plaintiff of liberty "without providing process adequate to justify their actions"). Plaintiff does not allege that he was denied notice, a hearing, or any other process before his bar license was suspended, alleging only that the proceeding was "tainted" by *ex parte* contacts and by reliance on the criminal findings. RSAC ¶¶ 132–33. Indeed, the suspension order indicates that the court "appointed a Referee to conduct a sanction hearing," at which Plaintiff testified and produced documentary evidence, and that Plaintiff made and was granted "numerous requests for adjournments to make a post-hearing submission which, in the end, he failed to submit." *Matter of Perry*, 236 N.Y.S.3d at 58–60. In other words, Plaintiff had an opportunity to clear his name at a formal disciplinary hearing prior to the suspension of his bar license, but failed to do so. The availability of such process offers another basis for dismissal of his stigma-plus claim. *See Blythe v. City of New York*, 963 F. Supp. 2d 158, 174 (E.D.N.Y. 2013) ("Assuming that plaintiff has adequately alleged a violation of her reputation interest, her stigma-plus claim nonetheless fails because she received all the process she was due in the form of a properly conducted § 3020–a [disciplinary] hearing."); *Jarzembek v. Cnty. of Erie*, 2021 WL 4711485, at *3 (W.D.N.Y. Oct. 8, 2021) ("Plaintiff's decision to forgo a disciplinary hearing when offered the opportunity to clear his name necessitates the dismissal of Plaintiffs' stigma-plus claim.").

Plaintiff has therefore not stated a stigma-plus claim, or any other claim, against Wynne based on her alleged communications with the AGC.

### III. Plaintiff Has Not Stated a Claim Against Mullins or Bardliving

Plaintiff asserts claims against Mullins and Bardliving for violation of the Fourth Amendment. RSAC ¶¶ 164–72. Plaintiff claims that Defendants violated the Fourth Amendment by "obtaining and executing warrants through deliberate or reckless falsehoods and omissions, by seeking sweeping non-particularized access to Plaintiff's digital life, and by using the searches as a censorship tool rather than for legitimate law-enforcement needs." *Id.* ¶ 164. Specifically, Plaintiff alleges that Bardliving and Mullins prepared affidavits that "omitted exculpatory context" and "relied on curated/altered materials supplied by . . . Putnam to convert protected speech into 'threats' and 'fear,'" and that Mullins and Bardliving "seized and held devices for prolonged periods without investigative necessity." *Id.* ¶¶ 165, 167.

Defendants initially suggest that the conduct of Mullins and Bardliving is shielded by absolute immunity. Dkt. No. 142 at 16–17; Dkt. No. 160 at 4–6. Defendants are correct that "[t]o determine whether an official enjoys absolute immunity, [courts] take a 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.'" *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Buckley*, 509 U.S. at 269). The Second Circuit has extended absolute immunity to "individual employees who assist such an official and who act under that official's direction in performing functions closely tied to the judicial process," including to non-lawyer employees of the district attorney's office. *Hill*, 45 F.3d at 660 (holding that social worker and videotape operators employed by DA's office were "entitled to the same degree of immunity as [the prosecutor] himself for their activities while assisting with the investigation and prosecution of the case against plaintiff"). At the same time, however, the Supreme Court has held that the act of obtaining an arrest warrant in

the absence of an ongoing proceeding may not be protected by absolute immunity. *See Malley v. Briggs*, 475 U.S. 335, 342–43 (1986) (rejecting the contention that a police officer should have absolute immunity for submitting a complaint and supporting affidavit to a court in order to obtain an arrest warrant and reasoning that the officer's action "is further removed from the judicial phrase of criminal proceedings than the act of a prosecutor in seeking an indictment"); *see also Washington*, 29 F.4th at 104 ("[A] prosecutor's direction to obtain an arrest warrant for an individual does not transform a police officer's action, in swearing to the arrest warrant affidavit or participating in the arrest, into a prosecutorial act cloaked with absolute immunity."); *cf. O'Neal v. Morales*, 679 F. App'x 16, 18 (2d Cir. 2017) (summary order) (applying absolute immunity where officer confirmed a discrete fact for a prosecutor that was relevant to a witness's testimony in an imminent trial because the investigative activity was "in furtherance of the advocacy function of preparing for judicial proceedings"). The availability of absolute immunity turns upon whether the "investigative acts [are] reasonably related to decisions whether or not to begin or to carry on a particular criminal prosecution." *Giraldo*, 694 F.3d at 166.

The Court need not conclude whether Mullins and Bardliving are entitled to absolute immunity here because they are clearly shielded by qualified immunity. "An officer is entitled to qualified immunity on claims of false arrest and malicious prosecution if the officer had 'arguable probable cause' to arrest and prosecute." *Grandinetti v. Tashjian*, 2026 WL 2682789, at *1 (2d Cir. Sept. 14, 2026) (summary order) (quoting *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017)). "Arguable probable cause exists where 'either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Escalera*, 361 F.3d at 743). "[I]t is well-established that a law enforcement official has probable cause to

arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Miloslavsky v. AES Eng'g Soc'y*, 808 F. Supp. 351, 355 (S.D.N.Y.1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993)). And "[p]robable cause may . . . exist [even] where the officer has relied on mistaken information, so long as it was reasonable for him to rely on it." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).

Plaintiff claims that Mullins and Bardliving prepared affidavits that they knew to be false because Putnam, Monaco, and Monaco's mother provided false information that they reasonably feared for their safety as a result of Plaintiff's social media posts. RSAC ¶¶ 81–84, 164. Plaintiff alleges that Bardliving "swore in an arrest affidavit" that Putnam and others "feared for their safety," yet when asked at trial about receiving a text message from Plaintiff herself with a link to the posts, she testified "Why would I be scared? No." *Id.* ¶ 82; *see* Dkt. No. 126-2 at 31 (stating that Bardliving was "informed by Ms. Putnam that the defendant's above-described conduct has caused Ms. Putnam substantial emotional harm in that it has caused Ms. Putnam to fear for her physical safety and to fear that her employment is threatened due to the defendant's public postings"). In Plaintiff's view, this shows that Bardliving "knew the complainants' fear was feigned, yet adopted their scripted language to justify unconstitutional warrants." RSAC ¶ 82. Construed liberally, Plaintiff seems to suggest that Bardliving should have known that Putnam, Monaco, and Monaco's mother could not have reasonably perceived Plaintiff's social media posts as threats. That Bardliving did not fear for her own safety when Plaintiff texted her a screenshot of the posts, however, does not mean she could not recognize that Putnam and the other targets of the posts might reasonably fear for theirs.

Plaintiff separately asserts that Mullins, "the lead affiant on the 2021 felony warrant," admitted at trial that he could identify "no specific [threats]" of harm or death, yet swore in the warrant that Plaintiff "placed persons in reasonable fear of injury or death." *Id.* ¶ 83. Plaintiff characterizes Mullins's statement as "a knowing falsehood calculated to create probable cause where none existed." *Id.* In preparing the affidavits, however, Mullins relied on information gathered from the victims and complaining witnesses of Plaintiff's social media posts. *See* Dkt. No. 126-2 at 23–25 (stating that arrest warrant's description of social media posts was "informed by" discussions with Putnam and Monaco). Plaintiff alleges no facts to establish that such reliance was unreasonable. That Mullins could identify no specific threat does not contradict Putnam's and others' assertions of fear, as the stalking offense charged turns on a course of conduct "likely to cause reasonable fear of material harm," not on an express threat. N.Y. Penal Law § 120.45(1); Dkt. No. 126-2 at 22. Plaintiff does not plausibly allege that Mullins knew that the complainants were not placed in fear or that he included in the warrant application any other information that he knew to be false, nor is there any evidence that the complainants did not fear for their safety. Moreover, as discussed *supra*, Plaintiff's subsequent conviction on the charges brought in Mullins's 2021 arrest warrant, which was upheld on appeal, *see Perry*, 218 N.Y.S.3d at 58, is conclusive evidence that probable cause existed as to those charges, *see Cameron*, 806 F.2d at 388–89; *Weyant*, 101 F.3d at 852.

Plaintiff therefore fails to state a Fourth Amendment claim against either Mullins or Bardliving, and any such claim would be barred by qualified immunity.

## IV. Plaintiff's Requests for Prospective Relief Are Dismissed for Lack of Standing and Failure to State a Claim for Relief

Plaintiff seeks injunctive relief with respect to the first and fourth counts of the RSAC, which raise claims under the First and Sixth Amendments, and pleads various requests for

injunctive relief. RSAC ¶¶ 372–74; Dkt. No. 156 at 6.[21] Plaintiff seeks the following relief with respect to Count I: "declaratory and injunctive relief dissolving the no-posing/gag provisions; enjoining 'speech-equals-contact' enforcement; and barring further use of paper-laundered 'notice' as substantive proof to restrict online speech." RSAC ¶ 157. On his fourth count, he seeks an order vacating the Protective Seal and permitting him to "examine or digitally search the discovery underlying his conviction" and directing a response to Freedom of Information Law requests he has made. *Id.* ¶ 189. In his Prayer for Relief, Plaintiff identifies the following injunctive relief he is demanding: (1) an injunction to "prevent continuing violations of federal rights, including tailored relief prohibiting 'speech-equals-contact' policies and any enforcement against William Perry predicated on public, non-threatening speech"; (2) an order directing Bragg, Mullins, and Bardliving "to identify, erase, seal, and/or return all data and records seized from William Perry pursuant to constitutionally defective warrants"; and (3) an order directing the modification or lifting of the Protective Seal that prohibits Plaintiff's "reasonable access to discovery necessary to vindicate his rights." *Id.* ¶¶ 372–74.[22] The doctrine of absolute immunity does not bar claims for prospective declaratory or injunctive relief. *Pulliam v. Allen*, 466 U.S.

---

[21] Defendants argue that Plaintiff's first and fourth through seventh claims are barred by *Heck v. Humphrey*. Dkt. No. 142 at 14–15. "The Supreme Court's decision in *Heck v. Humphrey* 'precludes the use of § 1983 suits for damages that necessarily have the effect of challenging existing state or federal criminal convictions.'" *Stegemann v. Rensselaer Cnty. Sheriff's Off.*, 2021 WL 5492966, at *2 (2d Cir. Nov. 23, 2021) (summary order) (quoting *Poventud v. City of New York*, 750 F.3d 121, 124 (2d Cir. 2014)). Under *Heck*, if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence . . . the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). Because Plaintiff's claims are barred by absolute or qualified immunity, the Court need not address whether his claims are additionally barred by *Heck*.

[22] Plaintiff also seeks injunctive relief on behalf of his mother and against defendants other than the Moving Defendants. *Id.* ¶¶ 375–76. The Court does not address those claims.

522, 541–42 (1984); *accord Shmueli*, 424 F.3d at 239. However, Plaintiff's requests for injunctive relief each falter on other grounds.

As to Plaintiff's request for an injunction barring any enforcement against Plaintiff for public, non-threatening speech, Plaintiff has failed to establish standing for his claim. Article III standing requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Standing limitations ensure that the plaintiff has a "personal stake" in the case, as "a federal court may resolve only 'a real controversy with real impact on real persons.'" *Id.* at 423–24 (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring)); *accord Ortiz v. Pace Univ.*, 761 F. Supp. 3d 695, 699–700 (S.D.N.Y. 2025). Where a plaintiff seeks redress for future or anticipated injury, the "threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *Golden v. Zwickler*, 394 U.S. 103, 109–10 (1969)). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

Plaintiff seeks relief from hypothetical prosecution for his social media posts. Even assuming that such prosecution would be unlawful, Plaintiff has not articulated a significant "likelihood that [he] will again be arrested for and charged with violations of the criminal law." *Lyons*, 461 U.S. at 102 (quoting *O'Shea*, 414 U.S. at 496). He has alleged that he continues to post on social media and that he has repeatedly alerted the DA's Office and other government officials to these posts. RSAC ¶¶ 127–130. Plaintiff has alleged that no enforcement action has

occurred due to these posts. *Id.* Plaintiff's asserted future harm is accordingly entirely speculative, hypothetical, and unlikely to occur. *See Peters v. Keurig Dr. Pepper Inc.*, 2026 WL 2622455, at *9 (E.D.N.Y. Sept. 4, 2026) (dismissing request for injunctive relief for lack of standing where plaintiff "relies solely on alleged past injury"); *Ribeiro v. Travis*, 2001 WL 893366, at *3 (S.D.N.Y. Aug. 8, 2001) (claims for prospective injunctive relief dismissed for lack of standing where plaintiff challenged future applicability of the New York parole guidelines but made no allegations that the guidelines would again be applied to him).

Plaintiff's remaining claims of post-judgment injury suffer from different flaws. For one, certain of the conduct of which he complains was not engaged in by the Moving Defendants. Plaintiff complains that the Protective Seal has prevented him from searching on his own the discovery underlying his conviction and that his FOIL requests have been denied. RSAC ¶¶ 131, 184. But it is ADA McCabe who is alleged to have denied his FOIL claim, *id.* ¶¶ 227, 235(b), and Judge Farber who issued the Protective Seal under New York C.P.L. § 245.70, *id.* ¶ 85, neither of whom is a Moving Defendant. Moreover, Plaintiff has not alleged how denial of a request under the New York Freedom of Information Law or the issuance of a protective seal under New York Criminal Procedure Law could give rise to a claim under Section 1983. *See Bey v. Carroll*, 2015 WL 1016087, at *2 (S.D.N.Y. Mar. 2, 2015) ("Plaintiff's allegation that Defendant denied a request for documents made pursuant to FOIL, a New York State law, does not implicate any federal law."); *Palacio v. Goord*, 338 F. App'x 37, 38 (2d Cir. 2009) (summary order) (dismissing claim of violation of New York procedural law because such violation does not create a cognizable cause of action under Section 1983).

With respect to Plaintiff's request for Bragg, Mullins, and Bardliving "to identify, erase, seal, and/or return all data and records seized . . . pursuant to constitutionally defective

warrants," RSAC ¶ 373, to the extent his claim challenges the initial deprivation of property without due process, it does not seek prospective relief and is barred by qualified immunity if not also by absolute immunity. *See supra* Part III. To the extent his claim sounds in the unlawful continued retention of property, Plaintiff has not alleged a violation of due process because, even assuming unlawful retention, a post-deprivation remedy for the loss is available. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property . . . does not constitute a violation of the procedural requirements of the Due Process Clause . . . if a meaningful post-deprivation remedy for the loss is available."). "New York law provides property owners with several remedies to recover property seized pursuant to a search warrant." *Best v. Monaco*, 2010 WL 1438756, at *2 (E.D.N.Y. Apr. 5, 2010). As explained by Judge Garaufis:

> If a criminal defendant successfully moves to suppress unlawfully seized property, the suppression court may, upon the defendant's request, order that the seized property be returned to him or her. *See* N.Y. Crim. Proc. § 710.70. If the defendant did not move to suppress the seized property, then he or she may move the court that issued the warrant to return the property. *See* N.Y. Crim. Proc. § 690.55 (disposition of seized property); *Matter of Moss v. Spitzer*, 798 N.Y.S.2d 482, 483 (2d Dep't 2005) ("property seized pursuant to a search warrant remains in the control of the issuing judge"). If no criminal prosecution is pending, a property owner may either file an action for replevin or a CPLR "[A]rticle 78 proceeding to review a refusal after demand." *Boyle v. Kelley*, 365 N.E.2d 866, 867 (N.Y. 1977). Because these state-law post-deprivation remedies provide Plaintiff with adequate process to assert his property rights, the court finds that Plaintiff cannot plead a violation of his federal due process rights. Accordingly, Plaintiff's claim for unlawful retention of his property without due process of law is dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

*Id.*; *see also Hayes v. Condlin*, 2026 WL 851355, at *5 (S.D.N.Y. Mar. 27, 2026) (plaintiff challenging unlawful deprivation of money and cigarettes following arrest could have pursued adequate state post-deprivation remedies by bringing a state-law claim in the Court of Claims). Plaintiff has not alleged that he was unable to pursue these remedies. Plaintiff thus has not alleged an unlawful deprivation. *See Suren v. City of New York*, 2022 WL 5414377, at *21

(E.D.N.Y. Aug. 8, 2022) (dismissing claim of deprivation of property following from police search where "New York has adequate post-deprivation remedies"), *report and recommendation adopted as modified*, 2022 WL 4466098 (E.D.N.Y. Sept. 26, 2022); *Hayes*, 2026 WL 8513555, at *5 (same).

Plaintiff's requests for injunctive relief are therefore dismissed.

## V. Plaintiff Has Failed to State a Claim for Civil Conspiracy Under Sections 1985(2) and 1985(3)

Plaintiff's ninth count alleges a claim for civil conspiracy to deprive him of his constitutional rights under 42 U.S.C. §§ 1985(2), (3). RSAC ¶¶ 251–61. Plaintiff alleges that the Moving Defendants along with defendants McCabe, Rosemarie Monaco, Seifullah, Rowe, Putnam, and Judge Pickholz, Farber, Hanshaft, Clott, Maeroff, Zayas, and Lupuloff all entered into a conspiracy beginning in May 2020 to "fabricate a retaliatory legal case against Plaintiff." *Id.* ¶ 251.

Section 1985(2) makes it illegal for two or more persons to "conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2).[23] "[A] claim under the second clause of Section 1985(2) requires 'a showing of class-based invidiously

[23] Clause 1 of Section 1985(2) makes it illegal for two or more persons to "conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States . . . from testifying to any matter pending therein, freely, fully, and truthfully." 42 U.S.C. § 1985(2). A claim under clause 1 only applies to proceedings in federal court. *See Grant v. Abbott House*, 2016 WL 796864, at *6 (S.D.N.Y. Feb. 22, 2016) (citing *Herrera v. Scully*, 815 F. Supp. 713, 726 (S.D.N.Y. 1993)). A claim under clause 1 of Section 1985(2) does not require a showing of class-based discrimination. *Zemsky v. City of New York*, 821 F.2d 148, 151 n.4 (2d Cir. 1987) (citing *Kush v. Rutledge*, 460 U.S. 719 (1983)).

discriminatory animus' on the part of the conspiring parties.'" *Langton v. Town of Chester Library Bd.*, 2020 WL 2850898, at *4 (S.D.N.Y. June 1, 2020) (quoting *Thomas v. DeCastro*, 2018 WL 1322207, at *12 (S.D.N.Y. Mar. 13, 2018)); *see Zemsky v. City of New York*, 821 F.2d 148, 151 (2d Cir. 1987). Section 1985(3) makes it illegal for two or more persons to conspire for the purpose of depriving "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To adequately plead a claim for conspiracy under Section 1985(3), a plaintiff must allege that the actions of the conspirators were "motivated by 'some racial or . . . [other] discriminatory animus.'" *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087–88 (2d Cir. 1993) (quoting *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 829 (1983)); *see also Mira v. Kingston*, 715 F. App'x 28, 30 (2d Cir. 2017) (summary order), *cert. denied*, 586 U.S. 822 (2018); *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (Section 1985(3) requires evidence "that the actions of the individual [defendants] were motivated by racial animus or ill-will"). The "plaintiff in the case of a 42 U.S.C. § 1985(2) claim, as in the case of a § 1985(3) claim, bears the burden of proving that defendants had a 'class-based' or other 'invidiously discriminating animus.'" *Herrmann v. Moore*, 576 F.2d 453, 458 (2d Cir. 1978) (quoting *Hahn v. Sargent*, 523 F.2d 461, 469 (1st Cir. 1975)).

"In order to maintain an action under Section 1985, a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003), *cert. denied*, 54 U.S. 1110 (2004) (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)); *see Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3), a plaintiff must first show that the defendants conspired—that is, reached an

agreement—with one another."). A plaintiff must allege "specific facts relating to the purported conspiracies." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013). "It is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.'" *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (quoting *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993)); *see San Filippo v. U.S. Tr. Co. of N.Y., Inc.*, 737 F.2d 246, 256 (2d Cir. 1984), *cert. denied*, 470 U.S. 1035 (1985) ("[C]onclusory allegations of conspiracy are insufficient to survive . . . a 12(b)(6) motion for dismissal."); *see also Abadi v. Am. Airlines, Inc.*, 2024 WL 1346437, at *26 (S.D.N.Y. Mar. 29, 2024) (dismissing Section 1985 conspiracy claim based upon conclusory allegations "masquerading as factual conclusions"); *Taranto v. Putnam Cnty.*, 2023 WL 6318280, at *12 (S.D.N.Y. Sept. 28, 2023) (dismissing complaint for failure to sufficiently plead conspiracy); *Gropper v. Fine Arts Hous., Inc.*, 12 F. Supp. 3d 664, 671–72 (S.D.N.Y. 2014) (same); *Brooks v. Cnty. of Nassau*, 54 F. Supp. 3d 254, 259 (E.D.N.Y. 2014) (same); *Roffman v. City of New York*, 2002 WL 31760245, at *5–6 (S.D.N.Y. Dec. 10, 2002) (same); *Arroyo-Horne v. City of New York*, 2019 WL 3428577, at *5 (E.D.N.Y. July 30, 2019), *aff'd*, 831 F. App'x 536 (2d Cir. 2020) (summary order) (dismissing § 1985 conspiracy claim where the complaint did "not provide any allegations or include any facts from which the Court could conclude that any individual(s) conspired to deprive Plaintiff of equal protection of the laws or equal privileges and immunities under the laws"); *Friends of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003), *aff'd sub nom. Friends of Gong v. Pac. Culture*, 109 F. App'x 442 (2d Cir. 2004) (summary order) (finding that the plaintiff failed to adequately plead a 1985(3) claim because "the complaint [did] not include any facts that could support an inference of a conspiracy among the various

defendants" and because the plaintiff "cite[d] no facts from which a meeting of the minds could be inferred").

Plaintiff fails to allege facts that support the existence of a conspiracy. Under Section 1985(2) as well as under Section 1985(3), "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann*, 576 F.2d at 459 (Section 1985(2)); *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71 (2d Cir. 1976) (Section 1985(3)); *see Biswas*, 973 F. Supp. 2d at 534–35 ("Under the 'intra-corporate conspiracy' doctrine, the officers, employees, and agents of the same corporate entity acting within their scope of employment, along with the corporate entity itself, are considered a single entity and are legally incapable of conspiring with each other."); *see Van Dunk v. Brower*, 2013 WL 5970172, at *15 (S.D.N.Y. Nov. 7, 2013) (no conspiracy alleged where plaintiff solely alleged that police officers within the same department conspired with one another). Plaintiff does not limit himself to the claims against the Moving Defendants acting in their official capacity. He also alleges the participation of the lay witnesses (Putnam and her counsel) and the judges presiding over various portions of Plaintiff's case. But that does not a conspiracy make. Plaintiff does not allege facts to support that the Moving Defendants, the lay witnesses, and the judges all reached an agreement on a common end, much less one that was discriminatory. From Plaintiff's allegations, each performed their assigned role—the witnesses provided information to the prosecutors, the prosecutors prosecuted the case, and the judges presided. The regular functioning of the criminal system, wherein witnesses, prosecutors, and judges participate in a single prosecution, does not support a claim of conspiracy. *See Toussaint v. Cnty. of Westchester*, 615 F. Supp. 3d 215, 228–29 (S.D.N.Y. 2022) (finding no non-conclusory

allegations of a meeting of the minds where plaintiff solely alleged prosecution for charges based on complainant's statements that were ultimately dropped); *cf. Cheruvu v. HealthNow New York, Inc.*, 2023 WL 3443362, at *2 (2d Cir. May 15, 2023) ("[T]he law is clear that the provision of information to law-enforcement agencies does not by itself make a private party a joint participant in state action under section 1983." (citation modified)). That the actions of each resulted in Plaintiff's convictions does not establish that the defendants all conspired with one another absent any allegation supporting a plausible inference of an agreement to act.[24] [25]

## VI. Plaintiff Has Not Alleged a *Monell* Claim

In his tenth count, Plaintiff alleges a *Monell* claim under 42 U.S.C. § 1983 against the City of New York and District Attorney Bragg. RSAC ¶¶ 262–68. Plaintiff asserts that the DA's Office, under Bragg's leadership, has adopted a municipal policy or custom or "repurpos[ing] lawful online speech into criminal charges," equating "speech . . . with prohibited 'contact,'" and routinely seeking blanket protective orders, as well as engaging in *Brady* violations and selectively favoring "white female complainants" over "Black male defendants." *Id.* ¶ 262.

Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, "a municipality can be held liable under Section 1983 if the deprivation of the

---

[24] The Court thus need not consider whether Plaintiff has adequately alleged class-based animus or an underlying constitutional violation.

[25] Plaintiff's civil conspiracy claim would also be barred by *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). *Heck* provides that if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence . . . the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 487. Although *Heck* itself involved a claim under Section 1983, "[t]he principle established in *Heck* . . . is not so limited." *Amaker v. Weiner*, 179 F.3d 48, 51 (2d Cir. 1999). It applies to claims such as those under Sections 1981, 1985, and 1986, that also would call the Plaintiff's conviction into question. *Id.* That principle and holding applies squarely here. Plaintiff's claim "turns on the asserted existence of a conspiracy" to unjustly prosecute him based on his race and his speech. *Id.* at 51–52. *Heck* therefore applies.

plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012). To state a claim for municipal liability, a plaintiff must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). "[A] plaintiff must prove a causal link between an official municipal policy or custom and a violation of his Constitutional rights." *Rodriguez v. City of N.Y.*, 2004 WL 444089, at *4 (S.D.N.Y. Mar. 10, 2004). A plaintiff can satisfy the "policy or custom" prong required to establish municipal liability by alleging "the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of [plaintiff's] rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to 'deliberate indifference to the rights of those with whom municipal employees will come into contact.'" *Johnson v. City of New York*, 2017 WL 2312924, at *19 (S.D.N.Y. May 26, 2017) (internal citations omitted).

Plaintiff has not alleged a single fact that supports the existence of a "custom or policy" that caused a violation of his rights. His complaint affirmatively undermines such a claim. He asserts, *inter alia*, that the prosecution in his case was "unprecedented." RSAC ¶ 262(b). His *Monell* claim therefore is dismissed.

**CONCLUSION**

The Moving Defendants' motion to dismiss is GRANTED.

Further amendment would not cure the fundamental deficiency that the majority of Plaintiff's claims are barred by either absolute or qualified immunity. *See Philippeaux v. United States*, 2019 WL 2082549, at *3 (S.D.N.Y. May 13, 2019) (dismissing claims against prosecutors based on absolute immunity without leave to replead); *Johnson*, 2017 WL 2312924,

at *12 (dismissing false arrest claim against police officers with prejudice as barred by qualified immunity). The following counts are therefore dismissed with prejudice as against the Moving Defendants: Counts I, II, IV through VII, IX, and X. Count III is dismissed without prejudice for lack of standing. The following counts are dismissed without prejudice as against the Moving Defendants for failure to file a Notice of Claim: Counts XI, XII, XIII, XIV, XV, XVI, XVII, and XVIII.

The Clerk of Court is respectfully directed to close Dkt. No. 140.

SO ORDERED.

Dated: September 30, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge